UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| LA'SHANE DONYALE SCOTT, a/k/a La'Shane Saadig,<br><br>Plaintiff,<br><br>vs.<br><br>DR. MARY CARPENTER, CHIEF MEDICAL OFFICIAL, INDIVIDUAL CAPACITY; WARDEN DAN SULLIVAN, CHIEF WARDEN OF SOUTH DAKOTA STATE PRISONS, INDIVIDUAL CAPACITY; NURSE LANA, CORRECTIONAL NURSE STAFF, INDIVIDUAL AND OFFICIAL CAPACITY; RYAN VANDERAA, UNIT MANAGER, WEST HALL, INDIVIDUAL AND OFFICIAL CAPACITY; JASON MILLS, UNIT COORDINATOR, WEST HALL, INDIVIDUAL AND OFFICIAL CAPACITY; SGT. SWAGGERT, OFFICER IN CHARGE, INDIVIDUAL AND OFFICIAL CAPACITY; OFFICER GANGLER, CORRECTIONAL OFFICER, INDIVIDUAL AND OFFICIAL CAPACITY; KAYLA TINKER, HEALTH SERVICES OFFICIAL, INDIVIDUAL AND OFFICIAL CAPACITY; CHARGE NURSE STEPHANIE, CHARGE NURSE HEALTH SERVICE, INDIVIDUAL AND OFFICIAL CAPACITY; UNKNOWN OFFICERS, CORRECTIONAL OFFICERS THAT WORKED IN THE WEST HALL UNIT, THE "SHU" FROM 10/26/2022 TO 10/30/2022, INDIVIDUAL AND OFFICIAL CAPACITY; UNKNOWN HEALTH SERVICES NURSING STAFF, CORRECTIONAL NURSING STAFF THAT WORKED IN THE SEGREGATED HOUSING UNIT FROM 10/26/2022 TO 10/30/2022, INDIVIDUAL AND OFFICIAL CAPACITY; KELLIE WASKO, SECRETARY OF THE DEPARTMENT OF CORRECTIONS, | 4:23-CV-04020-RAL<br><br><br>OPINION AND ORDER CONDUCTING 1915A SCREENING |

INDIVIDUAL AND OFFICIAL CAPACITY;
TERESA BITTINGER, OFFICIAL
CAPACITY; DR. AARON HAYNES,
OFFICIAL CAPACITY,

                    Defendants.

Plaintiff La'Shane Donyale Scott, an inmate at the South Dakota State Penitentiary, filed a

pro se lawsuit under 42 U.S.C. § 1983 and the Americans with Disabilities Act. Doc. 1. This

Court granted Scott leave to proceed in forma pauperis and ordered him to pay a $36.22 initial

partial filing fee. Doc. 8. Scott has also filed a motion to amend his complaint, a motion for

appointment of counsel, and a motion for a preliminary injunction and/or a protective order. Docs.

15, 16, 24. Scott timely paid $35.00 of his initial partial filing fee. Because Scott has substantially

complied with this Court's order requiring an initial partial filing fee, this Court considers Scott's

initial partial filing fee paid and now screens his complaint under 28 U.S.C. § 1915A.

## I.      Motion to Amend Complaint

Scott has filed a motion to amend his complaint. Doc. 15. Under Local Rule 15.1, a party

seeking to amend a pleading "must attach a copy of the proposed amended pleading to its motion

to amend with the proposed changes highlighted or underlined so that they may be easily

identified." D.S.D. Civ. LR 15.1. Scott has included with his motion a highlighted document that

includes a "Statement of Facts" and a "Statement of Claims[.]" Doc. 15-1. Although it is

somewhat unclear to what degree this filing is meant to replace, rather than simply supplement,

portions of his original complaint, see Docs. 1, 15-1, this Court finds that Scott has substantially

complied with Local Rule 15.1. Under Federal Rule of Civil Procedure 15(a)(1)(A), a party may

amend a pleading once as a matter of course 21 days after serving it. Defendants have not yet been

served in this case. Thus, Scott is granted leave to amend his complaint as a matter of course. This

Court will consider the allegations in Scott's amended complaint and in his various supplements when performing the § 1915A screening.

## II.    1915A Screening

### A.    Factual Allegations of Scott's Complaint

Scott claims that defendants have denied him medical care when he suffered a seizure while incarcerated at the South Dakota State Penitentiary. Doc. 1 at 18; Doc. 15-1 at 1–2. He alleges that his "first seizure and issues with hypertension and low blood sugars" occurred while incarcerated at the Mike Durfee State Prison on October 25, 2019. Doc. 15-1 at 1. He alleges that he then had a second seizure on October 29, 2022, at the South Dakota State Penitentiary. Id. at 2. Scott asserts in a supplement that he got into an altercation with another inmate, Triston Larson, in the weight room at the State Penitentiary on October 26, 2022, and that he was punched in the face and the back of his head repeatedly. Doc. 10 at 1. He states that after being transferred to the Segregated Housing Unit (SHU), Officer Boyseen dug his nails into Scott's wrists, causing Scott to argue with Boyseen. Id. at 2. He claims that Boyseen told him they should meet in the prison parking lot once Scott got out of prison, and Scott replied by telling Boyseen "what [he] would do to [Boyseen] if he kept digging [his] nails into [his] handcuffs." Id. Scott asserts that he was charged with an M-4 violation for threatening staff. Id.

Scott claims that he told officers and nursing staff that he "felt like [his] cell was going around in circles and that [he] could see little black spots in [his] vision" once he arrived at the SHU. Id. He alleges that he asked for his high blood pressure medications, Lisinopril and HCTZ, for approximately five days while in the SHU, but he did not receive these medications. See id. He asserts that he asked Nurse Lana for these medications, and Nurse Lana told him that she had emailed officers and unit staff at West Hall, where Scott was normally housed, but that it was

3

otherwise "out of her hands." See id. He also asserts that he asked Officer Gangler for his medication, who laughed at him and replied that the room must have been spinning because of "all of the 'Hennessy' that [Scott] use[d] to drink[.]" Id. Scott claims that he later asked Nurse Lana to place a new order for his medications, but she refused because the medications were in his cell pack up box, which he never received. Id. at 2–3. He claims that he made the same request to every nurse and officer that came to his cell door or came to pass out medications, but none provided him with his medication. Id. at 3.

Scott alleges that he told his SHU cellmate that he felt sick and dizzy and had to lie down on October 29, 2022. Id. He alleges that he asked for an officer in charge because he needed "a serious rush" on his cell pack up medication, but Sergeant Swaggert, who was on duty that night, never came to Scott's cell, even after an officer and a nurse called for him. Id. He claims that after using the toilet, he fell backwards and hit his head on a metal sink. Id. Scott asserts that he was later told by the officer who found him that he had had a grand mal seizure for 45 minutes in his cell. Id. He asserts that according to the officer who found him, he was "foaming at the mouth, unresponsive, hitting [his] head on the cement floor[,]" and that his eyes had "rolled to the back of [his] head." Id. He also asserts that State Penitentiary officials tried chest rubs, compressions, and smelling salts, and that they talked to him and tried to stop him from hitting his head on the ground. Id. Scott claims that he was rushed to Avera Hospital, where he "began to finally come out of seizure mode." Id. at 4. He was provided with anti-seizure medication and told that if he was ever sent to the SHU again, it would have to be the A-Floor of the Jameson Annex for easier access to emergency medical care. Id. Scott alleges that he was later told by former South Dakota State

Penitentiary Warden Dan Sullivan[1] that he did receive his seizure medication while in the SHU and that there was documentation that proved this to be true. Id. at 8. He asserts that he later "uncovered the truth" and that "Health Services Leadership recanted their claim of [him] getting [his] medications" while in the SHU. Id. at 9 (internal quotation omitted). In another supplement, Scott claims that medical staff told him that his lack of medication while in the SHU likely led to his seizure. Doc. 13 at 2.

Scott states that he had an administrative hearing for his M-4 charge regarding Boyseen and that the "Principal Prosecutor" was Unit Manager Ryan Vanderaa. Doc. 10 at 4. He states that he told Vanderaa and the other officials at his hearing about his mental health issues and medication, his altercation with Larson, and Boyseen's provocation of his threat. Id. He claims that he was found not guilty by the committee and released back to his West Hall unit. Id. He also claims that shortly afterwards, Larson was placed in his cell by Vanderaa and West Hall Unit Coordinator Jason Mills. See id. Scott alleges that he, another cellmate, and Officer DeKam protested Larson's placement because of the threat posed by Larson but that Larson was placed in his cell regardless. Id. at 5.

Scott claims that Vanderaa retaliated against him by refusing to allow him to be employed at the State Penitentiary school facility. Id. He claims that Nick Redmond, the Senior Educator at the school, wanted to employ him, but Vanderaa called another school officer and pressured her to hire a different inmate. Id. Scott states that Redmond then emailed Mills about employing him,

---

[1] Scott brings claims against Dan Sullivan, the former South Dakota State Penitentiary Warden. Doc. 1 at 2. Under Federal Rule of Civil Procedure 25(d), "[a]n action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party." Fed. R. Civ. P. 25(d). The current South Dakota State Penitentiary Warden is Teresa Bittinger, who is automatically substituted for Sullivan in Scott's official capacity claims. See id. Scott's individual capacity claims against Sullivan remain.

but he was still refused employment. Id. He alleges that he eventually got a job at the kitchen after an inmate worker shortage caused by lockdowns elsewhere at the State Penitentiary. See id. He asserts that Mills was reading his legal mail and initially refused to allow him to make copies or mail out this lawsuit, but eventually relented after he asked for an officer in charge. Id.; Doc. 9 at 1. Scott alleges that his legal mail was also read by DeKam during a shakedown of his cell. Doc. 24 at 3. He claims that he filed grievances regarding his denial of medication while in the SHU, Health Services falsely claiming that he had received his medication, the unsafe condition of placing Larson in his cell, and State Penitentiary officials' retaliation by preventing him from working. Doc. 1 at 20. He also claims that he filed grievances regarding Mills' interference with his lawsuit and that he complained to Major Rotert about Vanderaa and Mills preventing him from employment. See Doc. 10 at 6. He states that Rotert told him that Vanderaa and Mills were "out of line and wrong" to block him from employment if an employer specifically asked for him. Id. He also states that Rotert told him Vanderaa and Mills were wrong to put Larson in his cell. Id. He alleges that Mills then started asking him questions about the lawsuit when he was working in the kitchen. Id. He claims that he told Rotert and other prison officials, including Sullivan, about this as well. Id.

Scott asserts that he was approached by Swaggert while working in the kitchen on February 16, 2023. Id. at 6–7. He alleges that Swaggert sarcastically asked him, "why do [you] look so angry and mad all of the time?" Id. at 7. Scott states that he replied that he was Black and that this was his natural look. Id. Swaggert responded, "you said it not me[,]" and Scott replied, "yeah but you were probably thinking it and if not we would not be having a conversation." Id. He claims that he reported this incident verbally and in writing to Sullivan and other State Penitentiary officials, including Mental Health employees, Rotert, and Linda, the Kitchen Supervisor. Doc. 9

at 2.  He claims that he was fired from his kitchen job later that day by Linda, who told him that he needed to focus on his lawsuit and not be concerned with race.[2]  Doc. 10 at 7.  Scott asserts that he was not paid for and did not receive Earned Discharge Credits for 200 hours of work he performed in the kitchen.  Doc. 18-1 at 39.  In a response to a grievance filed on this issue, a State Penitentiary official states that Scott worked 176 hours and that he will get paid for those hours.  Doc. 19 at 22.  In another grievance, Scott argues that he has to file a grievance to get paid, whether he worked 176 or 200 hours.  Doc. 20 at 7.

Scott alleges that Mills has continued to interfere with his ability to access the courts since he first sought to file this lawsuit.  See, e.g., Doc. 13 at 4.  He claims that he asked Mills for a notary for one of his filings and Mills screamed at him to "bait him[.]"  Id.  Scott claims that after he filed grievances regarding retaliation, Mills came to his cell and told him that the First Amendment does not say anything about retaliation.  See Doc. 14 at 1.  He also claims that Mills came to his cell with his opened legal mail.  Id. at 2.  Scott asserts that State Penitentiary policies have hindered his legal filings by making it more difficult to contact and acquire an attorney.  See Doc. 17 at 2.  He alleges that the State Penitentiary removed the list of attorneys from tablets used by inmates, preventing him from contacting attorneys.  Id.  He also alleges that he now has to pay to call or send mail to legal aid services in South Dakota and that his requests to call attorneys have been denied.  Id.  Scott states that certain phone calls and mail have been marked as business, rather than legal.  Doc. 18-1 at 50; Doc. 19 at 26, 28, 30.

---

[2] In one supplement, Scott writes that Linda told him that he needed to "not play the race card." Doc. 10 at 7.  In another filing, he writes that Linda "said that [he] was the one being racial[.]" Doc. 9 at 2.  Scott does not use quotation marks in either filing when describing Linda's statement, and it is unclear if he is paraphrasing or quoting what he contends Linda said.  See Doc. 10 at 7; Doc. 9 at 2.

In supplements to his complaint, Scott asserts that State Penitentiary officials placed another dangerous inmate, Burton, in his cell in retaliation for his grievances and lawsuit.  See Doc. 19 at 24; Doc. 22-1 at 6.  He filed an Informal Resolution Request, filed on March 20, 2023, in which he explains that his cellmate was returned to his cell after being placed in the SHU for refusing housing.  Doc. 19 at 24.  He states that this cellmate had mental health issues and an "extreme history of assaults on his prior cell mates and officers."  Id.  He alleges that he reported his concerns to unit staff and officers, but nothing was done.  Id.; Doc. 22-1 at 6.  He specifically alleges in a Request for Administrative Remedy dated March 28, 2023, that he discussed this with DeKam, Case Manager Yost, and Corporal Sorenson, and that Sorenson told him that Unit Manager Nyreen was unaware of the issues with Burton and that Scott "should just be cool and put in a move slip."  See Doc. 22-1 at 6.

Scott claims that on March 28, 2023, a former cellmate attempted suicide by overdosing, and Scott provided aid by holding him up by the cell bars and alerting West Hall officers.  Doc. 22 at 2.  He claims that when officers entered his cell, they placed his Quran and his "Muslim Dictionary" on the ground and stepped on them, which is forbidden.  See id.  He states that he tried to explain the trauma induced by these actions, especially as they occurred during Ramadan, but that he was sent to the SHU from March 28 to approximately March 30 for this incident.  Id.  He alleges that he was again denied prescribed medications, including several medications for a MRSA infection.  Id.

Scott asserts that on April 4, 2023, he was housed in a cell in which officers had used "several cans of pepper spray" on the previous inmates.  Id. at 3.  He claims that pepper spray is a stressor for his seizures and that he pressed the emergency call button in his cell that night because he "felt the symptoms of a seizure coming on."  See id.  He states that five days later, he was

8

granted permission to clean the cell walls to remove pepper spray residue, but DeKam ordered him to stop in the middle of the cleaning.  Id.

In his most recent filing, Scott alleges that he was transferred to the East Hall Housing Unit, where East Hall Unit Coordinator William Allen told him that he could have a job and added him to the jobs list.  Doc. 24 at 5.  He states that he met with Redmond and that Redmond agreed to contact Allen about hiring him to work at the school.  Id.  Scott asserts that Allen then informed Redmond that he could not work at the school because of an infraction from nearly five years prior, despite Scott's employment at the Carpentry Shop for two years.  Id.  He alleges that Allen told him on May 11, 2023, that Mills and Nyreen had contacted Allen and told Allen not to let him work in retaliation for his grievances and lawsuit.  See id. at 5–6.  He claims that Allen refused to provide him a grievance form to file a grievance regarding this issue and that he filed complaints with Redmond, Allen, East Hall Unit Manager Eckeren, and South Dakota State Penitentiary Warden Teresa Bittinger.  Id. at 6.

Scott brings claims for violation of his Eighth Amendment right to be free from cruel and unusual punishment, his First Amendment right to be free from retaliation, and his Fourteenth Amendment right to due process.  See Doc. 1 at 7.  He also seeks to bring claims under the Americans with Disabilities Act (ADA).  Id.  Scott sues all defendants in their individual and official capacities.  Id. at 2–7.  He seeks injunctive relief to protect him from retaliation and abuse. See id. at 18; Doc. 24 at 11.  He specifically asks this Court to issue an injunction requiring that he be allowed to access a phone book in order to obtain counsel, that he be gainfully employed at the State Penitentiary school, and that he "be free of any and all forms of retaliation and campaign of harassment."  Doc. 24 at 11.  Scott asks for $50,000 in compensatory damages and $50,000 in punitive damages.  Doc. 15-1 at 8.

**B.   Legal Standard**

A court when screening under § 1915A must assume as true all facts well pleaded in the complaint. Estate of Rosenberg v. Crandell, 56 F.3d 35, 36 (8th Cir. 1995). Pro se and civil rights complaints must be liberally construed. Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam) (citation omitted); Bediako v. Stein Mart, Inc., 354 F.3d 835, 839 (8th Cir. 2004) (citation omitted). Even with this construction, "a *pro se* complaint must contain specific facts supporting its conclusions." Martin v. Sargent, 780 F.2d 1334, 1337 (8th Cir. 1985) (citation omitted); see also Ellis v. City of Minneapolis, 518 F. App'x 502, 504 (8th Cir. 2013) (per curiam) (citation omitted). Civil rights complaints cannot be merely conclusory. Davis v. Hall, 992 F.2d 151, 152 (8th Cir. 1993) (per curiam) (citation omitted); Parker v. Porter, 221 F. App'x 481, 482 (8th Cir. 2007) (per curiam) (citations omitted).

A complaint "does not need detailed factual allegations . . . [but] requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal citation omitted). If a complaint does not contain these bare essentials, dismissal is appropriate. See Beavers v. Lockhart, 755 F.2d 657, 663–64 (8th Cir. 1985). Twombly requires that a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true[.]" 550 U.S. at 555 (internal citation omitted); see also Abdullah v. Minnesota, 261 F. App'x 926, 927 (8th Cir. 2008) (per curiam) (noting that a complaint "must contain either direct or inferential allegations respecting all material elements necessary to sustain recovery under some viable legal theory" (citing Twombly, 550 U.S. at 553–63)). Further, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely." Braden v. Wal-Mart

Stores, Inc., 588 F.3d 585, 594 (8th Cir. 2009) (internal quotation omitted) (quoting Twombly,

550 U.S. at 556). Under 28 U.S.C. § 1915A, the court must screen prisoner complaints and dismiss

them if they "(1) [are] frivolous, malicious, or fail[] to state a claim upon which relief may be

granted; or (2) seek[] monetary relief from a defendant who is immune from such relief." 28

U.S.C. § 1915A(b).

### C.   Scott's Causes of Action

"Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that

each Government-official defendant, through the official's own individual actions, has violated

the Constitution." Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009).

> Thus, each Government official . . . is only liable for his or her own misconduct.
> As we have held, a supervising officer can be liable for an inferior officer's
> constitutional violation only if he directly participated in the constitutional
> violation, or if his failure to train or supervise the offending actor caused the
> deprivation.

Parrish v. Ball, 594 F.3d 993, 1001 (8th Cir. 2010) (cleaned up). Scott's individual capacity claims

must allege that each individual defendant either participated in the unconstitutional conduct or

caused the conduct to occur through a failure to train or supervise the offending actor. See id.

Personal involvement by defendant state officers is not required in a plaintiff's official capacity

claim for injunctive relief; all that is required is that the defendant officers, "by virtue of [their]

office[s], ha[ve] some connection" with the unconstitutional policy in question. See Ex parte

Young, 209 U.S. 123, 157 (1908).

"The requisite elements of Article III standing are well established: A plaintiff must allege

personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be

redressed by the requested relief." Patel v. U.S. Bureau of Prisons, 515 F.3d 807, 816 (8th Cir.

2008) (quoting Hein v. Freedom From Religion Found., Inc., 551 U.S. 587, 598 (2007)). Thus,

11

Scott only has standing to bring claims for injunctive relief if the relief he seeks would redress his alleged injuries. See id. (citing Hein, 551 U.S. at 598).

### 1.    Official Capacity Claims for Money Damages

Scott brings claims against all defendants in their official capacities for money damages. Doc. 1 at 2–7, 18; Doc. 15-1 at 2–8. All defendants were employees of the State of South Dakota at the times in question. See Doc. 1 at 2–7; Doc. 15-1 at 2–8. As the Supreme Court of the United States has stated, "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989) (citing Brandon v. Holt, 469 U.S. 464, 471 (1985)). Thus, it is a suit against the state itself. Id. While "[§] 1983 provides a federal forum to remedy many deprivations of civil liberties, . . . it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties." Id. at 66.

The Eleventh Amendment generally acts as a bar to suits against a state for money damages unless the state has waived its sovereign immunity. Id. But "a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983" and thus amenable to suit. Id. at 71 n.10 (citing Kentucky v. Graham, 473 U.S. 159, 167 n.14 (1985)). Here, Scott seeks both money damages and injunctive relief. Doc. 1 at 18; Doc. 15-1 at 8; Doc. 24 at 11. The State of South Dakota has not waived its sovereign immunity. Thus, Scott's claims against all defendants in their official capacities for money damages are dismissed with prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(iii) and 1915(b)(2).

### 2.    Eighth Amendment Deliberate Indifference to Serious Medical Needs Claims

Scott claims that defendants have denied him medical care during his incarceration at the State Penitentiary. Doc. 1 at 7; Doc. 15-1 at 1–2; Doc. 22 at 2–3. Construing his complaint

liberally, he brings claims for deliberate indifference to serious medical needs in violation of his Eighth Amendment right to be free from cruel and unusual punishment. See Doc. 1 at 7.

"[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." Estelle v. Gamble, 429 U.S. 97, 104 (1976) (quoting Gregg v. Georgia, 428 U.S. 153, 173 (1976)). "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Id. at 104–05 (footnotes omitted). "This conclusion does not mean, however, that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." Id. at 105. "[A] prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Id. at 106. Allegations of negligence will not suffice, nor will mere disagreement with treatment decisions. Jolly v. Knudsen, 205 F.3d 1094, 1096 (8th Cir. 2000) (citing Estate of Rosenberg, 56 F.3d at 37).

The deliberate indifference standard includes both an objective and subjective component. Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997) (citing Coleman v. Rahija, 114 F.3d 778, 784 (8th Cir. 1997)). The plaintiff "must demonstrate (1) that [he] suffered objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs." Id. (citing Coleman, 114 F.3d at 784). "A serious medical need is 'one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention.' " Coleman, 114 F.3d at 784 (quoting Camberos v. Branstad, 73 F.3d 174, 176 (8th Cir. 1995)). To be liable for deliberately disregarding medical needs, "the official must both be aware of facts from which the inference could be drawn

that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994).

Scott alleges facts sufficient to state claims for deliberate indifference to his serious medical needs. He alleges that he is prone to seizures and requires medication to prevent seizures. See Doc. 10 at 1–2. He also alleges that he had a MRSA infection for which he was prescribed medication. Doc. 22 at 2. Scott alleges that he has serious medical needs. See Doc. 10 at 1–2; Doc. 22 at 2. He claims that State Penitentiary officials were aware of his need for medication in both instances and refused to allow him his medication. See Doc. 10 at 2–3; Doc. 22 at 2. He also claims that he alerted State Penitentiary officials to his worsening state while in the SHU and that no one responded to his concerns. Doc. 10 at 2–3.

Scott's individual capacity claims must allege that each individual defendant was aware of and deliberately indifferent to his serious medical needs. See Farmer, 511 U.S. at 837. Scott alleges that Dr. Carpenter[3] failed to train and supervise State Penitentiary medical staff, causing the denial of his medication while in the SHU. Doc. 15-1 at 2. He alleges that he made Sullivan aware of his lack of medical care while in the SHU. Doc. 1 at 8; Doc. 15-1 at 3. Because Scott claims that he was later denied medication while in the SHU a second time, he alleges that Sullivan's failure to train or supervise State Penitentiary officials led to this second denial of medical care, even though it is unclear whether Sullivan was aware of and deliberately indifferent to the first denial of medical care while it was occurring or if he was merely informed of it afterwards. See Doc. 1 at 8; Doc. 15-1 at 3; Doc. 22 at 2. Although Scott acknowledges that Nurse

---

[3] Scott brings claims against Dr. Mary Carpenter, the former SD DOC Chief Medical Director. See Doc. 1 at 2; Doc. 15-1 at 2. The current SD DOC Chief Medical Director is Dr. Aaron Haynes, who is automatically substituted for Dr. Carpenter on Scott's official capacity claims. See Fed. R. Civ. P. 25(d).

14

Lana did ask State Penitentiary officials about his medication, he argues that she "failed to deliver necessary medications or re-order them from the Pharmacy or Prison Medical Shelf Stock." Doc. 15-1 at 4. This Court cannot determine at this early stage of litigation whether Nurse Lana was deliberately indifferent to Scott's serious medical needs by failing to act after inquiring as to the status of his medication.

Scott claims that Swaggert was informed of his need for medication while in the SHU by another officer and failed to respond. Doc. 1 at 11; Doc. 15-1 at 5–6. He alleges that he told Gangler that he was not feeling well and needed his medication and that Gangler responded by making a joke about Scott's alcohol use and failing to provide any assistance. See Doc. 1 at 11; Doc. 15-1 at 6. Scott claims that Kayla Tinker "shares the responsibility and overseeing and training of Nursing Staff and Senior Health Service Management and Leadership." Doc. 1 at 11. Thus, he alleges that Tinker's failure to train and supervise State Penitentiary officials caused the deprivation of his rights. See id. He states that Charge Nurse Stephanie was on site and "should have made sure that [he] received [his] medication" while in the SHU. Doc. 1 at 12. He also states that Unknown Health Services Leadership and Unknown Officers and West Hall Unit Staff[4] failed to provide him his medication. Doc. 1 at 12; Doc. 15-1 at 6–7. Scott claims that he informed Wasko of the denial of his medication and that she responded in writing that "[a] Restrictive Housing Status should not hinder Offenders from receiving necessary medications." Doc. 15-1 at 7. He alleges that Wasko "is responsible for training" State Penitentiary officials. Id. Similar to

---

[4] Scott names "Unknown Officers that worked in the West Hall Unit, the 'SHU' Unit from: 10/26/2022 to 10/30/2022" and "Unknown Health Service Nursing Staff that worked in the Segregated Housing Unit from 10/26/2022 to 10/30/2022" as defendants in his original complaint. Doc. 1 at 5. Scott refers to these defendants as "Unknown Health Services Leadership" and "Unknown Officers and West Hall Unit Staff" in his amended complaint. Doc. 15-1 at 6–7. This opinion will refer to these defendants as Unknown Health Service Leadership and Unknown Officers and West Hall Unit Staff.

Sullivan above, Scott alleges that Wasko's failure to train or supervise led to a second denial of medical care, regardless of whether he alleges that Wasko was aware of and deliberately indifferent to the first denial of medical care while it was occurring. See Doc. 1 at 13; Doc. 15-1 at 7; Doc. 22 at 2.

Scott does not allege that any other defendants participated in the unconstitutional conduct or caused it to occur through a failure to train or supervise. See Doc. 1 at 8–13; Doc. 15-1 at 2–8; see also Parrish, 594 F.3d at 1001. Thus, Scott's Eighth Amendment deliberate indifference to serious medical needs claims against Dr. Carpenter, Sullivan, Nurse Lana, Swaggert, Gangler, Tinker, Charge Nurse Stephanie, Unknown Health Services Leadership, Unknown Officers and West Hall Unit Staff, and Wasko in their individual capacities survive § 1915A screening, and his Eighth Amendment deliberate indifference to serious medical needs claims against all other defendants in their individual capacities are dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

Although personal involvement is generally not required in official capacity claims for injunctive relief, see Ex parte Young, 209 U.S. at 157, because the alleged constitutional violation is cruel and unusual punishment in violation of the Eighth Amendment and because punishment requires intent, some level of subjective knowledge is still required. See Farmer, 511 U.S. at 844. Other courts have held that this subjective component can be met through "the institution's historical indifference" rather than the knowledge held by a specific individual after that individual was substituted as the named official capacity defendant. LaMarca v. Turner, 995 F.2d 1526, 1542 (11th Cir. 1993); see also Alberti v. Sheriff of Harris Cnty., 978 F.2d 893, 894–95 (5th Cir. 1992) (per curiam) (finding "that the state knew" of severe overcrowding in Harris County jails); Terry ex rel. Terry v. Hill, 232 F. Supp. 2d 934, 944 (E.D. Ark. 2002) (considering "the entire state of

Arkansas, including the executive and legislative branches," to determine whether "the State ha[d] been deliberately indifferent to the needs of pretrial detainees" because defendant, "[i]n his official capacity, . . . [was] merely a representative of . . . the State of Arkansas in the system of mental health treatment" (footnote omitted)).

Scott sufficiently alleges institutional awareness of and indifference to his serious medical needs to state official capacity claims for injunctive relief. But Scott only has standing to bring claims for injunctive relief if the relief he seeks would redress his alleged injuries. See Patel, 515 F.3d at 816 (citing Hein, 551 U.S. at 598). Scott does not seek injunctive relief regarding his medical care. See Doc. 1 at 18; Doc. 15-1 at 8; Doc. 24 at 11. Thus, Scott's Eighth Amendment deliberate indifference to serious medical needs claims against all defendants in their official capacities for injunctive relief are dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

### 3.    Eighth Amendment Conditions of Confinement Claims

Scott claims that State Penitentiary officials have deliberately housed him in the same cell as two inmates who posed a threat to his safety and have prevented him from fully cleaning his cell to remove pepper spray residue that could cause him harm. Doc. 10 at 4–5; Doc. 19 at 24; Doc. 22 at 3; Doc. 22-1 at 6. Construing his complaint liberally, Scott brings claims for deliberate indifference to unsafe conditions of confinement in violation of the Eighth Amendment. See id.

"[T]he Constitution 'does not mandate comfortable prisons'; it prohibits 'inhumane ones.'" Williams v. Delo, 49 F.3d 442, 445 (8th Cir. 1995) (quoting Farmer, 511 U.S. at 832). The Supreme Court has clarified that only "extreme deprivations" that deny "the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." Hudson v. McMillian, 503 U.S. 1, 9 (1992) (internal quotation omitted). The Supreme

Court has listed as basic human needs "food, clothing, shelter, medical care, and reasonable safety[.]" Helling v. McKinney, 509 U.S. 25, 32 (1993) (internal quotation omitted).

In order to prevail on an Eighth Amendment conditions of confinement claim, a prisoner must prove that (1) objectively, the deprivation was "sufficiently serious" to deprive him of "the minimal civilized measure of life's necessities" or to constitute "a substantial risk of serious harm" to his health or safety; and (2) subjectively, the defendants were deliberately indifferent to the risk of harm posed by the deprivation. Simmons v. Cook, 154 F.3d 805, 807 (8th Cir. 1998) (quoting Farmer, 511 U.S. at 834). An Eighth Amendment challenge to conditions of confinement requires examining the totality of the circumstances. Villanueva v. George, 659 F.2d 851, 854 (8th Cir. 1981) (en banc). Even if no single condition would be unconstitutional in itself, the cumulative effect of prison conditions may subject inmates to cruel and unusual punishment. See id.; see also Tyler v. Black, 865 F.2d 181, 183 (8th Cir. 1989) (en banc).

Under Farmer, an inmate need not "await a tragic event" when seeking a preventative remedy for unsafe conditions. 511 U.S. at 845 (quoting Helling, 509 U.S. at 33–34). Although Farmer was decided in the context of an inmate seeking injunctive relief to prevent future harm, the United States Court of Appeals for the Eighth Circuit has applied this principle to claims seeking both injunctive relief and money damages. See Blackmon v. Lombardi, 527 F. App'x 583, 585 (8th Cir. 2013) (per curiam).[5]

Scott alleges facts sufficient to state Eighth Amendment claims for deliberate indifference to unsafe conditions of confinement. He claims that he was housed with an inmate, Larson, who

---

[5] In Blackmon, the Eighth Circuit did not comment on the relief sought by the plaintiff. See 527 F. App'x at 583–85. But the Western District of Missouri ruling overturned in relevant part by the Eighth Circuit noted that the plaintiff sought "injunctive relief and $4,000,000.00 in damages." Blackmon v. Lombardi, 2013 WL 12145820, at *1; 2013 U.S. Dist. LEXIS 196445, at *3 (W.D. Mo. Jan. 28, 2013).

18

had previously punched him in the face and head repeatedly. Doc. 10 at 1, 4. He states that he was later housed with Burton, another dangerous inmate. Doc. 19 at 24. He also claims that he was not allowed to fully clean pepper spray residue, which exacerbated his medical symptoms, from his cell walls. Doc. 22 at 3. Again, Scott's individual capacity claims must allege that each individual defendant was aware of and deliberately indifferent to the unsafe conditions of confinement. See Farmer, 511 U.S. at 837. Scott alleges that Sullivan "ignored [his] complaints about [his] safety when putting a dangerous inmate into [his] cell[.]" Doc. 1 at 8. He claims that Vanderaa and Mills placed Larson in his cell despite his and DeKam's objections. Id. at 10; Doc. 15-1 at 4–5.

In his original complaint, Scott alleges that "all of these acts fall into [Wasko's] hands and leadership." Doc. 1 at 13. He claims that he has "informed her of everything that has occurred and transpired." Id. Scott indicates a desire to bring a failure to protect claim and a deliberate indifference claim against Wasko. Construing his complaint liberally, Scott alleges that Wasko's failure to train and supervise State Penitentiary officials caused the alleged deprivations of his rights. See id.; Parrish, 594 F.3d at 1001. Scott does not allege that any other defendants participated in the unconstitutional conduct or caused it to occur through a failure to train or supervise. See Doc. 1 at 8–13; Doc. 15-1 at 2–8; see also Parrish, 594 F.3d at 1001. Although Scott states that he informed State Penitentiary officials of the threat posed by Burton and the pepper spray residue, he does not allege that any named defendant officials were aware of and deliberately indifferent to these threats, other than his claim that Wasko failed to train and supervise State Penitentiary officials. See Doc. 1 at 8–13; Doc. 15-1 at 2–8; Doc. 19 at 24; Doc. 22 at 3; Doc. 22-1 at 6.

Thus, Scott's Eighth Amendment deliberate indifference to conditions of confinement claims regarding the placement of Larson in his cell against Sullivan, Vanderaa, Mills, and Wasko in their individual capacities and his Eighth Amendment deliberate indifference to conditions of confinement claims regarding the placement of Burton in his cell and the pepper spray residue against Wasko in her individual capacity survive § 1915A screening. Scott's Eighth Amendment deliberate indifference to conditions of confinement claims regarding Larson against all defendants except Sullivan, Vanderaa, Mills, and Wasko in their individual capacities and his Eighth Amendment deliberate indifference to conditions of confinement claims regarding Burton and the pepper spray residue in his cell against all defendants except Wasko in their individual capacities are dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

Scott sufficiently alleges institutional awareness of and indifference to the unsafe conditions of confinement to state official capacity claims for injunctive relief. Scott expresses a desire to be "free of retaliation from Inmates, Officers and Staff." Doc. 1 at 18. He specifically seeks an injunction to "be free of any and all forms of Retaliation and Campaign of Harassment." Doc. 24 at 11. Thus, because Scott seeks an injunction to prevent further threats to his safety such as the placement of unsafe inmates in his cell, he has standing to bring these claims for injunctive relief. See Patel, 515 F.3d at 816 (citing Hein, 551 U.S. at 598). Scott's Eighth Amendment deliberate indifference to conditions of confinement claims regarding the unsafe inmate placements and the pepper spray residue in his cell against all defendants in their official capacities for injunctive relief survive § 1915A screening.

### 4.   Fourteenth Amendment Due Process Claims

#### a.   Employment Claims

Scott claims that his Fourteenth Amendment due process rights were violated by Vanderaa and Mills when they refused to allow him employment despite his being found not guilty at his disciplinary hearing. See Doc. 1 at 9–10. He challenges SD DOC Policy 1.5.A.1 § IV(1)(H),[6] which governs inmate work assignments and pay, as unconstitutional. Doc. 24 at 4. He also claims that he has not received payment or Earned Discharge Credits for the hours that he worked in the kitchen. Doc. 18-1 at 39.

"The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake." Smith v. McKinney, 954 F.3d 1075, 1079 (8th Cir. 2020) (quoting Wilkinson v. Austin, 545 U.S. 209, 221 (2005)). But "[i]nmates have no constitutional entitlement to tenure in prison jobs." Lyon v. Farrier, 727 F.2d 766, 769 (8th Cir. 1984) (per curiam) (citation omitted). "Whatever liberty or property interests inhere in prison employment are the product of state law." Id. (citing Peck v. Hoff, 660 F.2d 371, 373 (8th Cir. 1981)); see also I.S.B. v. State of S.D. Comm'r of Admin., 2011 WL 1316594, at *9, 2011 U.S. Dist. LEXIS 37036, at *26 (D.S.D. Apr. 1, 2011) ("[A] property interest in prison employment, and in the compensation derived from it, can only be created by state law." (citing Lyon, 727 F.2d at 769)). A property interest in prison employment is only created when state law uses "language of an unmistakably mandatory character[.]" Lyon, 727 F.2d at 769 (quotation omitted).

---

[6] Scott describes the policy that he challenges as "Inmate Work Assignments and Pay Policy, 1.5.A.1 Section 1(H)." Doc. 24 at 4. The policy in question appears to be Policy 1.5.A.1 § IV(1)(H), which states: "No inmate has an implied right or expectation to work in any particular job or assignment (See SDCL § 24-2-7). Inmates are subject to transfer to another job or removal from any job assignment at the discretion of the employer, supervisor or Warden. Inmates have no right to an assignment from which they were removed for any reason or right to continued employment."

Here, Scott fails to state a claim for violation of his Fourteenth Amendment due process rights regarding prison employment.   Because Scott has no constitutional right to prison employment, he must identify state law that creates a property interest in prison employment through the use of "language of an unmistakably mandatory character" under Lyon.   See id. (quotation omitted).   Scott identifies no such statute, and the South Dakota statute governing compensation for inmate labor uses permissive, not mandatory, language.   See Doc. 1 at 9–10; Doc. 15-1 at 4–5; SDCL § 24-4-9 ("The warden *may* authorize monetary compensation to inmates for work performed under the provisions of [the South Dakota statute authorizing inmate labor]." (emphasis added)).   Thus, he cannot bring a claim under the Fourteenth Amendment's Due Process Clause regarding his employment, including his challenge to the SD DOC inmate work assignments and pay policy.

In a grievance attached to his original complaint, Scott argues that his inability to obtain employment "may deprive [him] of a liberty interest if it affects parole eligibility or good time credits." Doc. 1-1 at 16.  The Eighth Circuit has explained that "[g]ood-time (or earned-time) credits usually shorten an inmate's sentence.   Therefore, when an inmate alleges unlawful deprivation of good-time credits, the relief he seeks is immediate or speedier release from imprisonment and 'his sole federal remedy is a writ of habeas corpus.' " Minter v. Bartruff, 939 F.3d 925, 928 (8th Cir. 2019) (quoting Preiser v. Rodriguez, 411 U.S. 475, 500 (1973)).  This Court recently applied Minter to a § 1983 claim in which the plaintiff sought an injunction ordering that he be awarded Earned Discharge Credits that the defendant never provided him.  Thares v. Wallinga, 2023 WL 3389030, at *8, 2023 U.S. Dist. LEXIS 84594, at *27–29 (D.S.D. May 11, 2023).  In Thares, this Court found that the plaintiff's "§ 1983 claim seeking injunctive relief

against [defendant] in her official capacity for failure to award Earned Discharged Credits" was barred. Id. at *8, 2023 U.S. Dist. LEXIS 84594, at *29.

Here, although Scott does not seek injunctive relief providing Earned Discharge Credits, he seeks money damages for the deprivation of his rights. See Doc. 1 at 18; Doc. 15-1 at 8; Doc. 24 at 11. "[I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid," a plaintiff must show "that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus[.]" Heck v. Humphrey, 512 U.S. 477, 486–87 (1994) (footnote omitted). Scott has not made such a showing. See Doc. 1 at 9–10, 18; Doc. 1-1 at 16; Doc. 15-1 at 4–5, 8.

To the extent that Scott brings a Fourteenth Amendment due process claim for State Penitentiary officials' failure to pay him for his hours worked in the kitchen, that claim fails as well. Under the Fourteenth Amendment, a "State [cannot] deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1. An intentional deprivation of property does not violate due process if there is an adequate post-deprivation remedy. Hudson v. Palmer, 468 U.S. 517, 533 (1984). But when "the property deprivation is effected pursuant to an established state procedure[,]" a post-deprivation state remedy does not satisfy due process. Id. at 534 (citing Logan v. Zimmerman Brush Co., 455 U.S. 422 (1982)). SDCL § 21-3-3 recognizes a cause of action for wrongful conversion of personal property. Scott makes no allegations that the deprivation of property occurred "pursuant to an established state procedure." See Palmer, 468 U.S. at 534; Doc. 18-1 at 39. Thus, an adequate post-deprivation remedy exists. Scott's Fourteenth

Amendment due process employment claims are dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(l).

### b.    Grievance Policy Claims

In an attached grievance, Scott claims that his grievances are not "thoroughly and honestly investigated" by Mills, resulting in unfair outcomes. Doc. 22-1 at 12. Scott asks for an arbitrator unrelated to this lawsuit to review and answer his grievances. Id. Construing his complaint liberally, Scott alleges that the State Penitentiary's handling of his grievances violates his Fourteenth Amendment right to due process. See id. "While a violation of a state-created liberty interest can amount to a violation of the Constitution, not every violation of state law or state-mandated procedures is a violation of the Constitution." Buckley v. Barlow, 997 F.2d 494, 495 (8th Cir. 1993) (per curiam) (holding that a refusal to process grievances alone did not state a constitutional deprivation.). "[A prison] grievance procedure is a procedural right only, it does not confer any substantive right upon the inmates. Hence, it does not give rise to a protected liberty interest requiring the procedural protections envisioned by the [F]ourteenth [A]mendment." Id. (first alteration in original) (quoting Azeez v. DeRobertis, 568 F. Supp. 8, 10 (N.D. Ill. 1982)); see also King v. Houston, 556 F. App'x 561, 563 (8th Cir. 2014) (per curiam) (explaining that, under Buckley, "prison officials' failure to process or investigate grievances, without more, is not actionable under § 1983" (citing 997 F.2d at 495)).

Here, Scott claims that his grievances are handled in an unfair manner, resulting in biased outcomes. See Doc. 22-1 at 12. These claims fail under Buckley. See 997 F.2d at 495. Thus, Scott's Fourteenth Amendment due process claims for grievance process issues are dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(l).

### 5.    First Amendment Access-to-the-Courts Claim

24

Scott brings claims for violation of his First Amendment right to access the courts.  Doc. 15-1 at 5.  "The Constitution guarantees prisoners a right to access the courts."  White v. Kautzky, 494 F.3d 677, 679 (8th Cir. 2007).  To succeed on a claim for denial of access to the courts, a plaintiff must show that he suffered actual injury as a result of the defendants' actions.  Lewis v. Casey, 518 U.S. 343, 349 (1996).  In order to satisfy the actual injury requirement, a plaintiff must "demonstrate that a nonfrivolous legal claim had been frustrated or was being impeded."  Johnson v. Missouri, 142 F.3d 1087, 1089 (8th Cir. 1998) (quoting Casey, 518 U.S. at 353).

In Beaulieu v. Ludeman, the Eighth Circuit held that "[p]rivileged prisoner mail, that is mail to or from an inmate's attorney and identified as such, may not be opened for inspections for contraband except in the presence of the prisoner."  690 F.3d 1017, 1037 (8th Cir. 2012) (alteration in original) (quoting Gardner v. Howard, 109 F.3d 427, 430 (8th Cir. 1997)).  The Eighth Circuit "ha[s] never held or suggested that an isolated, inadvertent instance of opening incoming confidential legal mail will support a § 1983 damage action."  Id. (quoting Gardner, 109 F.3d at 431).  Beaulieu cautioned that an inmate plaintiff "'must demonstrate that he suffered prejudice' from the 'inadvertent opening of legal mail.'"  Id. (quoting Gardner, 109 F.3d at 431).  But when prison officials open privileged mail "deliberately and on a continuing basis[,]" an inmate's First Amendment rights may be violated, even without a showing of prejudice.  See Jensen v. Klecker, 648 F.2d 1179, 1183 (8th Cir. 1981) (per curiam) (finding that one piece of mail that was clearly marked as from an attorney and opened outside the presence of the inmate recipient, along with assertions that "the opening of such mail was done deliberately and on a continuing basis" and defendants' "vague claim that in the case of clearly marked mail some mistakes were made," required reversal of the lower court's grant of summary judgment in favor of defendants).

Here, Scott fails to state a claim for denial of his right to access the courts. Although Scott alleges that Mills and other State Penitentiary officials have interfered with his ability to pursue this lawsuit, he makes no showing that "a nonfrivolous legal claim ha[s] been frustrated or [i]s being impeded." See Johnson, 142 F.3d at 1089 (quoting Casey, 518 U.S. at 353); Doc. 15-1 at 5. Instead, he merely alleges that State Penitentiary officials have made filing this lawsuit more difficult. See Doc. 9 at 1; Doc. 10 at 5–6; Doc. 13 at 4; Doc. 15-1 at 5; Doc. 17 at 2; Doc. 18-1 at 50; Doc. 19 at 26, 28, 30; Doc. 24 at 3. Scott claims that Mills opened or read his legal mail outside his presence and that DeKam read his legal mail during a cell shakedown. Doc. 9 at 1; Doc. 10 at 5–6; Doc. 14 at 2; Doc. 24 at 3. Under Jensen, an inmate can state a claim for violation of his civil rights when his privileged mail is intentionally opened outside of his presence. See 648 F.2d at 1183. But privileged mail is "mail to or from an inmate's attorney and identified as such[.]" Beaulieu, 690 F.3d at 1037 (quoting Gardner, 109 F.3d at 430); see also Gardner, 109 F.3d at 431 ("The act of opening incoming mail does not injure an inmate's right to access the courts. The policy that incoming confidential legal mail should be opened in inmates' presence instead serves the prophylactic purpose of assuring them that confidential attorney-client mail has not been improperly read in the guise of searching for contraband.").

Scott alleges that Mills read the complaint he sought to file when he made copies of it and that Mills opened an order mailed to him by this Court. Doc. 9 at 1; Doc. 10 at 5–6; Doc. 14 at 2. Scott does not describe the legal mail read by DeKam. See Doc. 24 at 3. Although he describes the mail as "privileged legal mail" and states that legal mail is "mail between you and your attorney," Scott makes no allegations as to the contents of the mail that DeKam read. See id. at 3–4. While Scott describes his attempts to contact and acquire an attorney during this lawsuit, see Doc. 17 at 2, he does not allege that the piece of mail read by DeKam was a communication to or

from his attorney or a prospective attorney. See Doc. 24 at 3. He does not allege whether he was present for this incident, and unlike his allegations regarding Mills, he does not allege that DeKam's reading of his legal mail was intentional. See id.; Doc. 14 at 2; see also Laughlin v. Stuart, 2022 WL 12165755, at *1, 2022 U.S. App. LEXIS 29321, at *2 (8th Cir. 2022) (per curiam) (finding that isolated incidents of seizing documents from plaintiff's cell were insufficient to establish a free speech violation "even assuming the documents seized . . . were legal mail"). Scott also does not name DeKam as a defendant in this lawsuit. See Doc. 1 at 2–7; Doc. 15-1 at 2–8. Thus, Scott's First Amendment access-to-the-courts claims are dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(l).

### 6.    First Amendment Retaliation Claims

Scott brings claims for retaliation in violation of his First Amendment rights. Doc. 1 at 7. He alleges that Vanderaa and Mills retaliated against him for filing grievances and a lawsuit by placing a dangerous inmate in his cell and by preventing him from obtaining employment while incarcerated. See Doc. 10 at 4–5; Doc. 14 at 1–2; Doc. 24 at 5–6. He also alleges that State Penitentiary officials placed a second dangerous inmate in his cell in retaliation for his grievances and lawsuit. See Doc. 19 at 24; Doc. 22-1 at 6.

To allege a First Amendment retaliation claim, a plaintiff must "show (1) he engaged in a protected activity, (2) the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity." Spencer v. Jackson County, 738 F.3d 907, 911 (8th Cir. 2013) (quoting Revels v. Vincenz, 382 F.3d 870, 876 (8th Cir. 2004)). "[T]he plaintiff must show the official took the adverse action because the plaintiff engaged in the protected [activity]." Revels, 382 F.3d at 876. "The filing of a prison grievance, like the filing of

27

an inmate lawsuit, is protected First Amendment activity." Lewis v. Jacks, 486 F.3d 1025, 1029 (8th Cir. 2007) (citing Dixon v. Brown, 38 F.3d 379, 379 (8th Cir. 1994)).

Scott alleges facts sufficient to state claims for First Amendment retaliation. He alleges that he has been retaliated against for filing grievances and a lawsuit. See Doc. 10 at 4–5; Doc. 14 at 1–2; Doc. 19 at 24; Doc. 22-1 at 6; Doc. 24 at 5–6. Grievances and lawsuits are protected First Amendment activities under Jacks. 486 F.3d at 1029 (citing Dixon, 38 F.3d at 379). He alleges that he has been denied employment, costing him opportunities to receive Earned Discharge Credits, and that he has been housed with unsafe inmates. See Doc. 1-1 at 16; Doc. 10 at 5; Doc. 14 at 1; Doc. 19 at 24; Doc. 22-1 at 6; Doc. 24 at 5–6. As discussed above, Scott's employment claims do not allege standalone constitutional violations. But the Eighth Circuit has stated that "an act in retaliation for the exercise of a constitutionally protected right is actionable under [§] 1983 even if the act, when taken for a different reason, would have been proper." Madewell v. Roberts, 909 F.2d 1203, 1206 (8th Cir. 1990) (quoting Freeman v. Blair, 793 F.2d 166, 178 (8th Cir. 1986), vacated on other grounds, 483 U.S. 1014 (1987)). Thus, Scott alleges that he engaged in protected activities, that Vanderaa and Mills took adverse action against him that would chill a person of ordinary firmness from further engaging in those activities, and that the adverse action was motivated at least in part by his engaging in protected activities. See Doc. 10 at 4–5; Doc. 14 at 1; Doc. 19 at 24; Doc. 22-1 at 6; Doc. 24 at 5–6.

Under Parrish, Scott must allege that each individual defendant either directly participated in the unconstitutional conduct or caused it to occur through a failure to train or supervise. 594 F.3d at 1001. Scott alleges that Vanderaa and Mills directly participated in unconstitutional retaliation. Doc. 1 at 9–10; Doc. 15-1 at 4–5. Scott claims that he complained to Sullivan about "the racial comments and conduct of . . . Swaggert" and was then fired from his kitchen job out of

28

retaliation. Doc. 15-1 at 3–4, 6. Although Scott does not allege much detail about Sullivan and Swaggert's participation in the retaliation, he does allege that they retaliated against him for writing a complaint about this incident. See id.; Doc. 9 at 2. As above, Scott alleges that "all of these acts fall into [Wasko's] hands and leadership." Doc. 1 at 13. He states that she "failed in her Administrative duties, and is responsible for training." Doc. 15-1 at 7. Construing his complaint liberally, Scott alleges that Wasko's failure to train or supervise State Penitentiary officials caused the deprivation of his rights. Scott does not allege that any other defendants participated in the unconstitutional conduct or caused it to occur through a failure to train or supervise. See Doc. 1 at 8–13; Doc. 15-1 at 2–8; see also Parrish, 594 F.3d at 1001. Thus, Scott's First Amendment retaliation claims against Sullivan, Vanderaa, Mills, Swaggert, and Wasko in their individual capacities survive § 1915A screening, and his First Amendment retaliation claims against all other defendants in their individual capacities are dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

Scott's First Amendment retaliation claims against defendants in their official capacities for injunctive relief need only allege that each defendant, "by virtue of his [or her] office, has some connection" with the unconstitutional policy in question for which Scott seeks injunctive relief. See Ex parte Young, 209 U.S. at 157. Scott seeks an injunction to remedy current retaliation and prevent future retaliation. See Doc. 1 at 18; Doc. 24 at 11. Thus, Scott has standing to bring these claims for injunctive relief. See Patel, 515 F.3d at 816 (citing Hein, 551 U.S. at 598). Scott's First Amendment retaliation claims against all defendants in their official capacities for injunctive relief survive § 1915A screening.

### 7. Fourteenth Amendment Equal Protection Claim

Scott claims that Swaggert "taunt[ed]" and "harassed" him and "used racial slurs" while he was working in the kitchen. See Doc. 15-1 at 6. Scott alleges that this behavior was a violation of the First Amendment, although he does not indicate how his First Amendment rights were violated. See id. Construing his complaint liberally, Scott brings against Swaggert and Wasko claims for violation of his Fourteenth Amendment right to equal protection of the laws. See Doc. 1 at 13; Doc. 15-1 at 6–7.

The Equal Protection Clause of the Fourteenth Amendment requires the government to " 'treat similarly situated people alike,' a protection that applies to prison inmates." Murphy v. Mo. Dep't of Corr., 372 F.3d 979, 984 (8th Cir. 2004) (quoting Rouse v. Benton, 193 F.3d 936, 942 (8th Cir. 1999)). To show an equal protection violation, a plaintiff "must show that he is treated differently than a similarly situated class of inmates, that the different treatment burdens one of his fundamental rights, and that the different treatment bears no rational relation to any legitimate penal interest." Id. (citing Weiler v. Purkett, 137 F.3d 1047, 1051 (8th Cir. 1998) (en banc)). It is also an equal protection violation if "the different treatment is based upon . . . a suspect classification[.]" Patel, 515 F.3d at 815 (8th Cir. 2008) (citations omitted). "Suspect classifications include those such as race, alienage, gender, or national origin." Knapp v. Hanson, 183 F.3d 786, 789 (8th Cir. 1999) (citing City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 440 (1985)).

Here, Scott alleges facts sufficient to state Fourteenth Amendment equal protection claims against Swaggert and Wasko. Scott claims that he was the victim of Swaggert's racial taunting and harassment and that he was fired after complaining about this behavior. Doc. 15-1 at 6. Although he makes no mention of Swaggert's treatment of inmates of other races, Scott alleges that Swaggert singled him out and targeted him when he taunted and harassed him. See id. This

30

Court cannot conclude at this early stage of litigation that Scott fails to state a claim for a violation

of his Fourteenth Amendment equal protection rights against Swaggert because he alleges that

Swaggert insulted him and had him fired and that this behavior was racially motivated. See id.

Again, Scott alleges that Wasko's failure to train and supervise State Penitentiary officials caused

the constitutional deprivations in question, including the alleged violation of his equal protection

rights. See Doc. 1 at 13; Doc. 15-1 at 7. Scott does not allege that any other defendants participated

in the unconstitutional conduct or caused it to occur through a failure to train or supervise. See

Doc. 1 at 8–13; Doc. 15-1 at 2–8; see also Parrish, 594 F.3d at 1001. Thus, Scott's Fourteenth

Amendment equal protection claims against Swaggert and Wasko in their individual capacities

survive § 1915A screening, but his Fourteenth Amendment equal protection claims against all

other defendants in their individual capacities are dismissed without prejudice under 28 U.S.C. §§

1915(e)(2)(B)(ii) and 1915A(b)(1).

Scott's Fourteenth Amendment equal protection claims against defendants in their official

capacities for injunctive relief need only allege that each defendant, "by virtue of his [or her] office,

has some connection" with the unconstitutional policy in question for which Scott seeks injunctive

relief. See Ex parte Young, 209 U.S. at 157. Scott seeks injunctive relief to help him access the

courts, to provide him with employment while incarcerated, and to protect him from retaliation

and harassment. See Doc. 1 at 18; Doc. 24 at 11. But he does not seek an injunction regarding

violations of his Fourteenth Amendment equal protection rights. See Doc. 1 at 18; Doc. 24 at 11.

Thus, Scott does not have standing to bring Fourteenth Amendment equal protection claims against

defendants in their official capacities for injunctive relief. See Patel, 515 F.3d at 816 (citing Hein,

551 U.S. at 598). Scott's Fourteenth Amendment equal protection claims against all defendants

31

in their official capacities for injunctive relief are dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

### 8.    ADA Claims

Scott expresses a desire to brings claims under the ADA in his initial complaint, but he does not articulate the ADA claims that he seeks to bring. See Doc. 1 at 7. There are various means of discrimination under the ADA, including intentional discrimination, failure to make reasonable accommodations, and retaliation. See Peebles v. Potter, 354 F.3d 761, 765 (8th Cir. 2004); Rinehart v. Weitzell, 964 F.3d 684, 689 (8th Cir. 2020). Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; see also Mason v. Corr. Med. Servs., Inc., 559 F.3d 880, 886 (8th Cir. 2009). Title V of the ADA prohibits discrimination against "any individual because such individual has opposed any act or practice made unlawful by [the ADA.]" 42 U.S.C. § 12203(a). Even when construing his complaint liberally, Scott fails to state ADA claims for intentional discrimination, failure to make reasonable accommodations, and retaliation. See Doc. 1 at 7.

### a.    Intentional Discrimination Claims

Intentional discrimination is also known as disparate treatment. Peebles, 354 F.3d at 765. "In disparate treatment cases, a similarly situated disabled individual is treated differently because of his disability than less- or non-disabled individuals. The key element is discriminatory intent." Id. at 766 (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 153 (2000)). Scott's need for medication to control seizures may render him a qualified individual with a disability. See 42 U.S.C. § 12102(1) (defining "disability" under the ADA). But Scott makes no showing

32

that he has been treated differently than less- or non-disabled individuals as required under Peebles. See Doc. 1 at 8–13; Doc. 15-1 at 2–8; 354 F.3d at 766 (citing Reeves, 530 U.S. at 153). Thus, Scott's ADA claims for intentional discrimination are dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

### b.    Failure to Make Reasonable Accommodations Claims

To succeed on a failure to provide reasonable accommodations claim, a plaintiff must show:

> (1) that he is a qualified individual with a disability; (2) that he was excluded from participation in or denied the benefits of the [penitentiary's] services, programs, or activities, or was otherwise subjected to discrimination by the [penitentiary]; and (3) that such exclusion, denial of benefits, or other discrimination was by reason of his disability.

Baribeau v. City of Minneapolis, 596 F.3d 465, 484 (8th Cir. 2010) (per curiam). Here, Scott alleges that he was excluded from obtaining medication, and "'medical services' . . . at state prisons are benefits within the meaning of Title II[.]" Mason, 559 F.3d at 886 (quoting Pa. Dep't of Corr. v. Yeskey, 524 U.S. 206, 210 (1998)). In order to show that the exclusion was "by reason of his disability[,]" Scott need not show that the exclusion was motivated by a discriminatory purpose, only that his exclusion was caused by his disability. See Layton v. Elder, 143 F.3d 469, 470–72 (8th Cir. 1998) (finding that the wheelchair-using plaintiff had been "excluded . . . because of his disability" when he could not attend a meeting on the inaccessible second floor of the courthouse, even though there was no showing of intent to discriminate).

Scott fails to show that he was excluded from medical care because of his disability. Although he may be disabled under the ADA and claims that he did not receive his medication, he makes no allegations that he was not provided medication because of his disability or that his disability hindered his ability to receive his medication. See Doc. 1 at 8–13; Doc. 15-1 at 2–8.

Thus, Scott's ADA claims for failure to make reasonable accommodations are dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

### c.      ADA Retaliation Claims

To succeed on a retaliation claim under the ADA, a plaintiff must establish that "(1) he engaged in statutorily protected activity; (2) adverse action was taken against him; and (3) a causal connection exists between the adverse action and protected activity." Rinehart, 964 F.3d at 689.

Scott does not state claims for retaliation under the ADA because he does not allege engagement in statutorily protected activity connected to the ADA or a causal connection between the protected activity and adverse action. See id. Scott alleges that he filed grievances regarding his denial of medication while in the SHU, arguably an activity protected under the ADA. See Doc. 1 at 20. He alleges that State Penitentiary officials retaliated against him for filing grievances by preventing him from working and by placing a dangerous inmate in his cell, but those grievances related to the alleged failure to provide appropriate medical care and not to violation of ADA-protected rights, if any, that Scott claimed. See id. Thus, Scott's ADA claims for retaliation are dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

## III.    Motion for Preliminary Injunction and/or Protective Order

Scott filed a motion for a preliminary injunction. Doc. 24. "A preliminary injunction is an extraordinary remedy[.]" Roudachevski v. All–American Care Ctrs., Inc., 648 F.3d 701, 705 (8th Cir. 2011); see also Hughbanks v. Dooley, 788 F. Supp. 2d 988, 992 (D.S.D. 2011) (citing Munaf v. Geren, 553 U.S. 675, 689–90 (2008)). "The burden of proving that a preliminary injunction should be issued rests entirely with the movant." Goff v. Harper, 60 F.3d 518, 520 (8th Cir. 1995) (citation omitted).

When ruling on a motion for preliminary injunction, the court considers "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981) (en banc).  Since Dataphase, the Eighth Circuit has "observed that the 'likelihood of success on the merits is most significant.'" Barrett v. Claycomb, 705 F.3d 315, 320 (8th Cir. 2013) (quoting S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist., 696 F.3d 771, 776 (8th Cir. 2012)).

The Eighth Circuit has held that "the failure to show irreparable harm is, by itself, a sufficient ground upon which to deny a preliminary injunction[.]" Adam–Mellang v. Apartment Search, Inc., 96 F.3d 297, 299 (8th Cir. 1996) (quoting Gelco Corp. v. Coniston Partners, 811 F.2d 414, 418 (8th Cir. 1987)).  To demonstrate irreparable harm, a plaintiff must show that the injury is certain, great, and "of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." Packard Elevator v. Interstate Com. Comm'n, 782 F.2d 112, 115 (8th Cir. 1986) (internal quotations omitted). A "plaintiff must make a showing of actual, substantial harm resulting from the alleged infringement." Gard v. Dooley, 2014 WL 4243586, at *1, 2014 U.S. Dist. LEXIS 118740, at *3 (D.S.D. Aug. 26, 2014) (quoting Travelers Express Co. v. Transaction Tracking Techs., Inc., 305 F. Supp. 2d 1090, 1095 (D. Minn. 2003)).

Moreover, "in the prison context, a request for injunctive relief must always be viewed with great caution because 'judicial restraint is especially called for in dealing with the complex and intractable problems of prison administration.'" Goff, 60 F.3d at 520 (quoting Rogers v. Scurr, 676 F.2d 1211, 1214 (8th Cir. 1982)).  And "for an injunction to issue 'a right must be violated'

and . . . 'the court must determine' whether 'a cognizable danger of future violation exists and that danger must be more than a mere possibility.' " Id. (quoting Rogers, 676 F.2d at 1214).

Here, Scott's claims relate to past events and do not present a compelling case for a threat of irreparable harm to him. Further, this Court cannot at this early stage conclude that Scott is likely to prevail on the merits. Scott's allegations that he has been denied medication and retaliated against are serious. But they are allegations supported only by his complaint and the supplements to his pleadings. This Court is reluctant to fashion an injunction telling defendants how to run their facility or creating special rules for dealing with Scott, and the public interest disfavors such federal judicial interference with State Penitentiary operations absent more compelling evidence than an inmate's complaint. See Goff, 60 F.3d at 520 (citing Rogers, 676 F.2d at 1214). As a result, his motion for a preliminary injunction is denied, but this Court may reconsider it upon motion of Scott after defendants respond to Scott's complaint.

Scott also moves for a protective order. Doc. 24. This Court construes Scott's motion as a motion for a temporary restraining order. See id. Under the Federal Rules of Civil Procedure, a court may issue a temporary restraining order without notice to the adverse party only if "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition[.]" Fed. R. Civ. P. 65(b)(1)(A). This court denies Scott's motion for a temporary restraining order for the same reasons it has denied the motion for preliminary injunction.

## IV.    Motion for Appointment of Counsel

Scott has filed a motion for appointment of counsel. Doc. 16. "A pro se litigant has no statutory or constitutional right to have counsel appointed in a civil case." Stevens v. Redwing, 146 F.3d 538, 546 (8th Cir. 1998). In determining whether to appoint counsel to a pro se litigant,

36

this Court considers the complexity of the case, the ability of the litigant to investigate the facts, the existence of conflicting testimony, and the litigant's ability to present his claims. Id. At this time, Scott's claims are numerous but do not appear to be complex, and he is able to investigate the facts and present his claims adequately. This Court believes that Scott is capable of pursuing his claims pro se at this phase of litigation, and his motion for appointment of counsel, Doc. 16, is denied at this time.

## V. Order

Accordingly, it is

ORDERED that Scott's motion to amend complaint, Doc. 15, is granted. It is further

ORDERED that Scott's claims against all defendants in their official capacities for money damages are dismissed with prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(iii) and 1915A(b)(2). It is further

ORDERED that Scott's Eighth Amendment deliberate indifference to serious medical needs claims against Dr. Carpenter, Sullivan, Nurse Lana, Swaggert, Gangler, Tinker, Charge Nurse Stephanie, Unknown Health Services Leadership, Unknown Officers and West Hall Unit Staff, and Wasko in their individual capacities survive § 1915A screening. It is further

ORDERED that Scott's Eighth Amendment deliberate indifference to conditions of confinement claims regarding the placement of Larson in his cell against Sullivan, Vanderaa, Mills, and Wasko in their individual capacities survive § 1915A screening. It is further

ORDERED that Scott's Eighth Amendment deliberate indifference to conditions of confinement claims regarding the placement of Burton in his cell and the pepper spray residue against Wasko in her individual capacity survive § 1915A screening.

37

ORDERED that Scott's Eighth Amendment deliberate indifference to conditions of confinement claims against all defendants except Dr. Carpenter in their official capacities for injunctive relief survive § 1915A screening.  It is further

ORDERED that Scott's First Amendment retaliation claims against Sullivan, Vanderaa, Mills, Swaggert, and Wasko in their individual capacities survive § 1915A screening.  It is further

ORDERED that Scott's First Amendment retaliation claims against all defendants except Dr. Carpenter in their official capacities for injunctive relief survive § 1915A screening.  It is further

ORDERED that Scott's Fourteenth Amendment equal protection claims against Swaggert and Wasko in their individual capacities survive § 1915A screening.  It is further

ORDERED that all of Scott's remaining claims against all defendants are dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).  It is further

ORDERED that Scott's motion for preliminary injunction and/or protective order, Doc. 24, is denied.  It is further

ORDERED that Scott's motion for appointment of counsel, Doc. 16, is denied.  It is further

ORDERED that the Clerk shall send blank summons forms and U.S. Marshals Service forms (Form USM-285) to Scott so that he may complete the form to cause the complaint to be served upon Defendants Dr. Mary Carpenter, Dan Sullivan, Nurse Lana, Ryan Vanderaa, Jason Mills, Sgt. Swaggert, Officer Gangler, Kayla Tinker, Charge Nurse Stephanie, Unknown Health Services Leadership, Unknown Officers and West Hall Unit Staff, Kellie Wasko, Teresa Bittinger, and Dr. Aaron Haynes.  It is further

ORDERED that Scott shall complete and send the Clerk of Court a separate summons and USM-285 form for each defendant.  Upon receipt of the completed summons and USM-285 forms,

the Clerk of Court will issue the summonses.  If the completed summons and USM-285 forms are not submitted as directed, the complaint may be dismissed.  It is further

ORDERED that the United States Marshals Service shall serve the completed summonses, together with a copy of the complaint, Doc. 1, the amendment to the complaint, Doc. 15-1, and this opinion and order upon the defendants.  It is further

ORDERED that the defendants will serve and file an answer or responsive pleading to the complaint on or before 21 days following the date of service or 60 days if the defendant falls under Fed. R. Civ. P. 12(a)(2) or (3).  It is finally

ORDERED that Scott will keep the court informed of his current address at all times. All parties are bound by the Federal Rules of Civil Procedure and by the court's Civil Local Rules while this case is pending.

DATED June ___29th___, 2023.

BY THE COURT:

ROBERTO A. LANGE
CHIEF JUDGE

39