UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | | |
|---|---|---|
| LA'SHANE DONYALE SCOTT, a/k/a La'Shane Saadiq | ) ) | |
| | ) | 4:23-CV-04020-RAL |
| Plaintiff, | ) ) | |
| vs. | ) | |
| | ) | |
| DR. MARY CARPENTER, CHIEF MEDICAL OFFICIAL, INDIVIDUAL AND OFFICIAL CAPACITY; WARDEN DAN SULLIVAN, CHIEF WARDEN OF SOUTH DAKOTA STATE PRISONS, INDIVIDUAL AND OFFICIAL CAPACITY; NURSE LANA, CORRECTIONAL NURSE STAFF, INDIVIDUAL AND OFFICIAL CAPACITY; RYAN VANDERAA, UNIT MANAGER, WEST HALL, INDIVIDUAL AND OFFICIAL CAPACITY; JASON MILLS, UNIT COORDINATOR, WEST HALL, INDIVIDUAL AND OFFICIAL CAPACITY; SGT. SWYGERT, OFFICER IN CHARGE, INDIVIDUAL AND OFFICIAL CAPACITY; OFFICER GANGLER, CORRECTIONAL OFFICER, INDIVIDUAL AND OFFICIAL CAPACITY; KAYLA TINKER, HEALTH SERVICES OFFICIAL, INDIVIDUAL AND OFFICIAL CAPACITY; CHARGE NURSE STEPHANIE, CHARGE NURSE HEAL TH SERVICE, INDIVIDUAL AND OFFICIAL CAPACITY; UNKNOWN OFFICERS, CORRECTIONAL OFFICERS THAT WORKED IN THE WEST HALL UNIT, THE "SHU" FROM 10/26/2022 TO 10/30/2022, INDIVIDUAL AND OFFICIAL CAPACITY; UNKNOWN HEALTH SERVICES NURSING STAFF, CORRECTIONAL NURSING STAFF THAT WORKED IN THE SEGREGATED HOUSING UNIT FROM 10/26/2022 TO 10/30/2022, INDIVIDUAL AND OFFICIAL CAPACITY; KELLIE WASKO, SECRETARY OF THE DEPARTMENT OF CORRECTIONS, INDIVIDUAL AND OFFICIAL CAPACITY, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| Defendants | ) | |

Plaintiff, La'Shane Donyale Scott, by and through undersigned counsel, hereby files this memorandum in response to Defendants' motion for summary judgment. Doc. 149. The evidence in the record and the long list of disputed facts weigh heavily against summary judgment and in favor of trial. *See* Plaintiff's Opposing Statement of Material Facts and Additional Material Facts. Plaintiff respectfully requests that Defendants' motion for summary judgment be denied in its entirety.

## **LEGAL STANDARDS**

A defendant's motion for summary judgment must be denied if there is a genuine issue as to any material fact. Fed. R. Civ. P., Rule 56. Even where parties agree on the facts, "[s]ummary judgment is inappropriate when the record permits reasonable minds to draw conflicting inferences about a material fact." *Ozark Interiors, Inc. v. Local 978 Carpenters*, 957 F.2d 566, 569 (8th Cir. 1992). The summary judgment standard requiring courts to view the facts in the light most favorable to the non-moving party is no different when the movant raises the defense of qualified immunity. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014). The Supreme Court has stressed the "importance of drawing inferences in favor of the nonmovant, even when . . . a court decides only the clearly-established prong of the standard." *Tolan*, 572 U.S. at 657; *see also O'Neil v. City of Iowa City,* 496 F.3d 915, 917 (8th Cir. 2007). A defendant is not entitled to qualified immunity if the plaintiff shows: (1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the violation. Clearly established law means that reasonable official would know that his conduct was unlawful in the situation he confronted. *Davis v. Buchanan Cnty.*, 11 F.4th 604, 623 (8th Cir. 2021).

## **ARGUMENT**

I.     **Defendants Were Deliberately Indifferent to Mr. Scott's Unsafe Conditions of Confinement.**

The Eighth Amendment requires prisons to provide inmates with "food, clothing, shelter, medical care, and reasonable safety[.]" *Helling v. McKinney*, 509 U.S. 25, 32 (1993). Defendants have failed to provide safe housing to Mr. Scott as required by the Eighth Amendment by housing him with dangerous inmates and leaving him in a cell contaminated with pepper spray exacerbating his medical symptoms.

A conditions-of-confinement claim is analyzed under a two-prong deliberate indifference standard. First, the violation must be "objectively and sufficiently serious" such that "the inmate is incarcerated under conditions posing a substantial risk of serious harm." *Kulkay v. Roy*, 847 F.3d 637, 642 (8th Cir. 2017) (quoting *Farmer*, 511 U.S. at 834) (quotation marks omitted).

Second, "[i]n a case challenging the conditions of confinement," Mr. Scott must show the Defendants subjectively acted with "deliberate indifference to inmate health or safety." *Id.* at 643. "An official is deliberately indifferent if he or she actually knows of the substantial risk and fails to respond reasonably to it." *Id.* (quoting *Young v. Selk*, 508 F.3d 868, 873 (8th Cir. 2007)). "To show deliberate indifference via circumstantial evidence, 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Id.* at 644 (quoting *Farmer*, 511 U.S. at 837).

In *Jensen v. Clarke,* the Eighth Circuit cited Chief Judge Posner's "cobra" analogy to explain deliberate indifference:

> 'To be guilty of deliberate indifference [prison officials] must know they are creating a substantial risk of bodily harm. If they place a prisoner in a cell that has a cobra, but they do not know that a cobra is there (or even that there is a high probability that there is a cobra there), they are not guilty of deliberate indifference . . . . But if they know that there is a cobra there or at least that there is a high probability of a cobra there, and do nothing, that is deliberate indifference.'

*Jensen v. Clark*, 94 F.3d 1191, 1197 (8th Cir. 1996) (quoting *Billman v. Indiana Dept. of Corrections*, 56 F.3d 785, 788 (7th Cir. 1995)).

Mr. Scott has met both the objective and subjective prongs such that a reasonable jury could find that Defendants were deliberately indifferent to his conditions of confinement.

### A. *Defendants Were Deliberately Indifferent to Mr. Scott's Conditions of Confinement by Placing Dangerous Inmates in His Cell.*

Prison officials and correctional officers have a duty to protect inmates from violence committed by other inmates. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994); *Wilson v. Seiter*, 501 U.S. 294, 303 (1991) (protection from other inmates is condition of confinement). As in *Jensen*, "the 'cobra' in the cell is the potentially violent cellmate a prisoner faces each time he enters his cell[.]" *Jensen*, 94 F.3d at 1197. Placing both Inmate Larson and Inmate Burton with Mr. Scott constituted deliberate indifference to his conditions of confinement.

Inmate Larson assaulted Mr. Scott on Oct. 26, 2022; Mr. Scott discussed this incident with prison officials at a following hearing. Exhibit F, Doc. 10 at 1, 4-5 (Declaration of La'Shane Scott). Soon after, in January 2023, prison officials placed Inmate Larson into Mr. Scott's cell despite his history of violent conduct towards Mr. Scott, leaving them as cellmates for approximately three weeks. Exhibit O, Doc. 1-1 at 6 (Complaint Attachments); Exhibit I, Doc. 1 at 9-10 (Complaint). Just a couple of months later, prison officials again placed another known-to-be-violent inmate, Inmate Burton, in the same cell as Mr. Scott. Exhibit L, Doc. 19 at 24-25 (Scott Supplement). Mr. Scott pursued formal and informal remedy processes at the prison to try to address the risk to his safety. Ex. O, Doc. 1-1 at 6, 18; Exhibit P, Doc. 5-1 (January 2023 IRR and Grievances); Ex. L, Doc. 19 at 24-25; Exhibit K, Doc. 22-1 at 6 (March and April 2023 IRR and Grievances). Mr. Scott believes both incidents were part of efforts to put him in harm's way

in retaliation for his grievances and complaints about the prison. Ex. O, Doc. 1-1 at 18, Ex. K, Doc. 22-1 at 6.

1. Placing Violent Cellmates with Mr. Scott Put Him at Substantial Risk of Serious Harm.

Placing dangerous inmates in the same cell as another inmate is objectively "sufficiently serious," denying the necessity of reasonable safety and posing a "substantial risk of serious harm." *See Kulkay*, 847 F.3d at 642; *Jensen*, 94 F.3d at 1198 (assigning cellmates without checking for compatibility considered sufficiently substantial risk of harm due to risk of violent assaults); *Walton v. Dawson*, 752 F.3d 1109, 1119-20 (8th Cir. 2014) (failure to lock cell doors at night to prevent assaults by other inmates considered sufficiently serious risk of harm); *Krein v. Norris*, 309 F.3d 487, 489-90 (8th Cir. 2002) (finding sufficient evidence in the record that at the time plaintiff was attacked by another inmate while he was sleeping, the officials were aware of the prison's inadequate staffing, high rate of violence in the unit, and its failure to track assaults in the unit).

As this Court has noted in its Opinion and Order Conducting 1915A Screening, a conditions claim is viable even if the danger created by Defendants does not come to violent fruition:

> Under *Farmer*, an inmate need not 'await a tragic event' when seeking a preventative remedy for unsafe conditions. Although *Farmer* was decided in the context of an inmate seeking injunctive relief to prevent future harm, the United States Court of Appeals for the Eighth Circuit has applied this principle to claims seeking both injunctive relief and money damages.

Doc. 25 at 18 (citing *Farmer*, 511 U.S. at 845; *Blackmon v. Lombardi*. 527 F. App'x 583, 585 (8th Cir. 2013) (per curiam)). It is enough that a violent danger exists. Defendants only need to "know that there is a cobra there" and "do nothing." *Jensen*, 94 F.3d at 1197. In other words, it is deliberate indifference to a substantial *risk*—not occurrence—of serious harm that results in a

viable conditions of confinement claim. *See Young*, 508 F.3d at 872-73 (analyzing only events occurring prior to a cellmate assault to determine the existence of a substantial risk of serious harm).

In *Young*, the plaintiff faced threatening behavior from his new cellmate and subsequently reported it to a prison official the same day, requesting an immediate transfer to a new cell. *Id.* at 870. The plaintiff then repeated his concerns to another official the next day. *Id.* The Eighth Circuit found that the dangerous cellmate's conduct was "the most probative evidence of the degree and type of risk that [the plaintiff] faced" and that his conduct toward the plaintiff alone raised a reasonable inference of a substantial threat of violence against the plaintiff. *Id.* at 872. The court also found that evidence of the plaintiff's state of mind "might also be of some relevance[;]" for instance, the fact that the plaintiff "promptly reported a threat, asked to be moved immediately, and, when no help was forthcoming, made the same plea the next day, may be some evidence of the existence of a risk of harm." *Id.*

*Jensen* contemplated double-celling in the context of widespread violence; here, as in *Young*, the danger of the "cobra" was concrete rather than statistical: both Mr. Scott and to Defendants knew Larson and Burton were violent. Inmate Larson had already assaulted Mr. Scott prior to their cell assignment together in the weight room; Inmate Larson gave Mr. Scott several blows to the face, after which Mr. Scott fell to the ground and Inmate Larson continued punching the back of his head. Ex. F, Doc. 10 at 1. Inmate Burton had an "extreme history of assaults on his prior cellmates and officers" and "told staff several times that he was 'unstable'" in the cell. Ex. L, Doc. 19 at 24-25. This prior violent conduct toward Mr. Scott specifically, as to Inmate Larson, and toward prior cellmates, as to Inmate Burton, is "the most probative evidence

of the degree and type of risk" that Mr. Scott faced—a substantial risk of assault by each individual. *See Young*, 508 F.3d at 872.

Mr. Scott's state of mind can also be considered in determining whether a substantial risk of serious harm existed. *Young*, 508 F.3d at 872. Mr. Scott "promptly reported" his concerns about Inmate Larson's placement as his cellmate to an officer, Ex. I, Doc. 1 at 21, and filed both an informal resolution request and a kite to the same effect, Ex. O, Doc. 1-1 at 6, 18. Similarly, Mr. Scott "reported his fears to unit staff and officers" about Inmate Burton's placement as his cellmate given his violent history and mental health issues and promptly filed an informal resolution request the same day. Ex. L, Doc. 19 at 24-25. These efforts to protect himself may also serve as "evidence of the existence of a risk of harm." *Young*, 508 F.3d at 872. A reasonable jury could infer that there was a substantial risk of serious harm to Mr. Scott in the form of inmate assault resulting from the placement of both Inmate Larson and Inmate Burton as his cellmates.

2. <u>Defendants Were Deliberately Indifferent to the Substantial Risk of Serious Harm Posed by Inmates Larson and Burton.</u>

To meet the subjective prong of his conditions of confinement claim regarding cellmate placement, Mr. Scott must show that the Defendants knew of the substantial risk and failed to respond reasonably to it. *Kulkay*, 847 F.3d at 643.

> When evidence is introduced 'showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.'

*Jensen*, 94 F.3d at 1198 (8th Cir. 1996) (quoting *Farmer*, 511 U.S. at 828).

Mr. Scott informed SDSP and the unit team of the substantial risk of serious harm posed by his cellmates each time with informal and formal notifications. Ex. O, Doc. 1-1 at 6 (kite regarding Larson); *id.* at 18 (informal resolution request regarding Larson); Ex. P, Doc. 5-1 (request for administrative remedy regarding Larson); Ex. L, Doc. 19 at 24-25 (informal resolution request regarding Burton); Ex. K, Doc. 22-1 at 6 (request for administrative remedy regarding Burton). These requests are part of his prison record, and anyone accessing it to determine housing would have known the danger he faced. Further, SDSP had institutional knowledge of the risks posed by each inmate. The assault by Inmate Larson was discussed at an administrative hearing at which Defendant Vanderaa was present, along with a Captain and unit manager and unit coordinator, prior to moving Larson into Mr. Scott's cell. Ex. F, Doc. 10 at 4-5. Inmate Burton's prior assaults on inmates and mental health issues would also have been known to all Defendants as they were documented in his correction file. Even if Defendants chose to not look at the files, they can be still liable for not looking into Inmate Burton's background— particularly after Mr. Scott raised concerns about his safety. *See Walton v. Dawson*, 752 F.3d 1109, 1119 (8th Cir. 2014) ("*Farmer*'s subjective standard does not invite prison supervisors to bury their heads in the sand"); *Farmer*, 511 U.S. at 843 n.8. ("a prison official . . . would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist").

Despite knowing both Mr. Scott's concerns and each violent inmate's history of assaults, Defendants placed him in cells with Inmate Larson and Inmate Burton. SDSP's response to one of Mr. Scott's informal resolution requests simply instructed him to "report [his] concerns to a staff member immediately" if he believed he was "in danger of being physically assaulted or

abused"—a step he had already, in fact, taken and had stated as such in his informal resolution request. Ex. K, Doc. 22-1 at 8; Ex. L, Doc. 19 at 24-25. Mr. Scott also had reported his concerns to Officer DeKam who had relayed Mr. Scott's concerns to Defendants Mills and Vanderaa, yet all Defendant Mills said was "I hope they're over it." Exhibit V, Doc. 11 at 1-2 (Declaration of Patrick Wayne Devore). A reasonable jury could therefore find that each person responsible for Mr. Scott's housing or overseeing the housing assignment process had "been exposed to information concerning the risk and thus 'must have known' about it," and yet failed to address it or were not properly trained to do so. *Jensen*, 94 F.3d at 1198 (assigning cellmates without checking for compatibility considered sufficiently substantial risk of harm due to risk of violent assaults).

### B. Defendants Were Deliberately Indifferent to Mr. Scott's Conditions of Confinement by Leaving Him in a Contaminated Cell.

As to the cell contaminated with pepper spray, Mr. Scott must similarly show both the objective and subjective prongs to establish a conditions of confinement claim. Leaving an inmate in an environment contaminated with pepper spray objectively creates a substantial risk of serious harm, and Defendants were clearly deliberately indifferent to that harm in their prevention of any efforts to clean it.

1. The Cell Contaminated with Pepper Spray Constituted a Substantial Risk of Serious Harm.

Prolonged, unventilated pepper spray residue exposure and denial of decontamination procedures present an obvious, serious risk of harm. *See Walker v. Bowersox*, 526 F.3d 1186, 1189 (8th Cir. 2008) (finding an actionable claim for leaving an inmate in pepper spray-contaminated cell and bedding without means to clean other than cell sink); *Burns v. Eaton*, 752 F.3d 1136, 1140 (8th Cir. 2014) (noting that refusal to allow decontamination after pepper spray

is one of the instances where the court denied summary judgment in Eighth Amendment claims); *Cody v. Hillard*, 599 F. Supp. 1025, 1029 (D.S.D. 1984) ("inadequate ventilation poses a severe health problem"); *Washington v. Denney*, 900 F.3d 549 (8th Cir. Aug. 13, 2018) (upholding jury verdict of deliberate indifference where prison knew inmate suffered from chronic condition exacerbated by air quality issues). Some courts have gone further, even finding that "subjecting a prisoner to special confinement that causes him to suffer increased effects of environmental conditions—here, the pepper spray lingering in the air and on him—can constitute excessive force." *Danley v. Allen*, 540 F.3d 1298, 1308 (11th Cir. 2008), *overruled on other grounds by Randall v. Scott*, 610 F.3d 701, 709 (11th Cir. 2010).

Mr. Scott was placed in a cell on Apr. 4, 2023, that was doused in several canisters' worth of pepper spray without the means to clean it. Exhibit M, Doc. 22 at 3 (Supplement Regarding Grievances). This is an obvious risk of harm to any individual. *See Walker*, 526 F.3d at 1189; *Burns*, 752 F.3d at 1140. It was particularly dangerous for Mr. Scott, as the pepper spray exacerbated Mr. Scott's seizure disorder, causing migraine headaches, blurred vision, and stomach pains. Ex. M, Doc. 22 at 3. This is evidence of the specific risk Mr. Scott suffered from the pepper spray contamination. *See Washington*, 900 F.3d 549. He was left in that contaminated cell without means to clean it for days on end. Ex. M, Doc. 22 at 3. On Apr. 9, 2023, he was given permission to clean it, but after only forty minutes the supplies for cleaning were taken away, prior to his being able to finish cleaning. Exhibit N, BATES17406 (Offenders Issue Report). This perpetuated the risk of substantial harm to Mr. Scott. *See Burns*, 752 F.3d at 1140.

2. <u>Defendants Were Deliberately Indifferent to the Substantial Risk of Serious Harm Posed by the Contaminated Cell.</u>

Mr. Scott must show the Defendants subjectively acted with "deliberate indifference to inmate health or safety." *Kulkay*, 847 F.3d at 643. "An official is deliberately indifferent if he or

she actually knows of the substantial risk and fails to respond reasonably to it." *Id.* (quoting *Young*, 508 F.3d at 873). "To show deliberate indifference via circumstantial evidence, 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Id.* at 644 (quoting *Farmer*, 511 U.S. at 837).

Here, Mr. Scott has demonstrated enough evidence for a reasonable jury to determine that the Defendants were aware of facts that indicated pepper spray contamination was a serious health risk to him and still failed to respond reasonably to it. On Apr. 9, 2023, he was given permission to clean it, but after only forty minutes the supplies for cleaning were taken away, prior to his being able to finish cleaning. Ex. N at BATES17406. The fact that he was initially allowed to clean indicates that the prison knew cleaning was required to avoid harm, and yet officials still prevented him from finishing cleaning. *See Reece v. Groose*, 60 F.3d 487, 491 (8th Cir. 1995) (relying on evidence of initial official protective measures taken as evidence that prison officials knew of the substantial risk that the protective measure was intended to prevent). Further, Mr. Scott filed both a request for administrative remedy and an informal resolution request about the issue, neither of which resulted in the prison taking action to ensure his cell was decontaminated. Ex. N at BATES17406-07. *See Burns*, 752 F.3d at 1140 (8th Cir. 2014) (noting that refusal to allow decontamination after pepper spray is one of the instances where the court denied summary judgment in Eighth Amendment claims). A reasonable jury could easily find that despite the prison being aware of the risk of leaving Mr. Scott, an already medically vulnerable individual with symptoms resulting from the contamination, in the contaminated cell without means to clean it, officials took no action to reasonably address the risk.

## II.     Defendants Were Deliberately Indifferent to Mr. Scott's Serious Medical Condition.

Defendants argue they are not liable for Mr. Scott's Eighth Amendment claims stemming from the withholding of his medication in October 2022 because he had not yet been diagnosed with a seizure condition. Irrespective of whether Mr. Scott had a formal diagnosis—a fact that is in dispute—he: (1) had a known history of seizures; (2) had been prescribed and did not receive seizure medications; and (3) had been diagnosed with at least one additional condition, hypertension, for which he did not receive medication that has a bidirectional comorbidity with epilepsy. Defendants did not need medical training to know that withholding medication from Mr. Scott would result in serious injury given his panoply of serious medical conditions. In light of this dispute of fact and clearly established law prohibiting correctional officers and nurses from withholding medication under these circumstances, Defendants' motion for summary judgment should be denied.

A plaintiff establishes a claim for medical deliberate indifference when he can show that he was suffering from an objectively serious medical need that defendants knew about the need but deliberately disregarded it. *Dadd v. Anoka Cnty.*, 827 F.3d 749, 755 (8th Cir. 2016); *Gordon v. Frank*, 454 F.3d 858, 862 (8th Cir. 2006). Failure to provide prescribed medical treatment for a serious medical condition is a clearly established Eighth Amendment violation in the Eighth Circuit. *Dadd*, 827 F.3d at 757 (8th Cir. 2016) ("[w]hen an official denies a person treatment that has been ordered or medication that has been prescribed, constitutional liability may follow"); *Letterman v. Does*, 789 F.3d 856, 862 (8th Cir. 2015) ("[T]he knowing failure to administer prescribed medicine can itself constitute deliberate indifference.") (quoting *Krout v. Goemmer*, 583 F.3d 557, 567 (8th Cir. 2009)); *Phillips v. Jasper Cnty. Jail*, 437 F.3d 791, 795-96 (8th Cir.

2006) ("[T]he knowing failure to administer prescribed medicine can itself constitute deliberate indifference.").

### A.  Mr. Scott Had Serious Medical Conditions.

When Mr. Scott was placed in SHU on October 26, 2022, it was clear to that he was not a well man. He had a documented history of seizures and high blood pressure. *See* Exhibit E, BATES13079 (Avera Discharge Plan) ("[h]e does have a history of seizure" and listing "hypertension" in medical history). Courts have recognized both of these diagnoses constitute a serious medical condition. *Kaiser Faisal Nur. v. Olmstead County*, 563 F.Supp.3d 946, 957 (D. Minn. 2021) (noting seizures are a serious medical condition); *Terry v. Parker*, 2021 U.S. Dist. LEXIS 21407 at *18-19 (E.D. Mo. 2021) (seizures controlled with prescription Dilantin plausibly are a serious medical condition); *see also Newberry v. Melton*, 726 Fed Appx 290, 295 n.2 (6th Cir. 2018) (collecting cases from other circuits that seizures are an objectively serious medical condition); *Haltiwanger v. Mobley*, 2000 U.S. App. LEXIS 23717 at *4 (8th Cir. 2000) (finding allegation of high blood pressure constituted a serious medical condition). Defendants seemingly do not dispute that these conditions are serious.

### B.  There is At Least a Dispute of Fact as to Whether Defendants Knew About Mr. Scott's Serious Medical Conditions.

Defendants insist that they cannot be liable for violating Mr. Scott's constitutional right to medical care because he had not been diagnosed with a seizure condition on October 29, 2022. Doc. 150 at 9. But this argument is premised on a dispute of fact and Defendants' profound misunderstanding of Eighth Amendment law. First, there is a genuine dispute as to whether Defendants knew about Mr. Scott's seizure condition prior to October 29, 2022. Hospital records note that Mr. Scott had a history of seizures. Ex. E at BATES13079 ("[h]e does have a history of seizure"). Mr. Scott's prison records acknowledge that he had had seizures prior to October 29,

13

2022. Exhibit C, BATES12244 (Jun. 7, 2022 Lab Results) (notation that lab results could be sub-therapeutic for both seizures and depression); Exhibit FF, BATES12962 (October 30, 2022 file noting that Mr. Scott had a seizure while in DOC custody in or around 2019); Exhibit D (Chronic Care Order) at BATES 6657 (listing "seizures" in the instructions for Mr. Scott's chronic care follow-up appointment on October 11, 2022). There is also record evidence that Mr. Scott had been prescribed seizure medication in the past and that he had not been provided it prior to his October 2022 seizure. Ex. E at BATES13077 ("Looking through his meds it looks like he is possibly taking Dilantin for the seizures… ***We did contact the correctional facility and it sounds like he has not been on Dilantin although this is on his medication list***.").[1] Mr. Scott also told correctional officers that he "needed his meds that he has epileptic problems." Exhibit B (Doc. 3, Declaration of Nathaniel Wright). Defendants claim that the absence of a formal diagnosis prior to October 29, 2022 somehow absolves them of liability but that position woefully misconstrues Eighth Amendment jurisprudence.

It is well-established that a defendant can be on notice of a serious medical condition even if there is no formal diagnosis in a plaintiff's correctional care file. *Troupe v. Young*, 2025 U.S. App. LEXIS 17123 at *25-26 (8th Cir. 2025) (finding corrections officers were subjectively aware of plaintiff's medical need notwithstanding lack of formal diagnosis due to presentation and self-reporting of symptoms); *Plemmons v. Roberts*, 439 F.3d 818, 824 (8th Cir. 2006)

---

[1] It is unclear how Avera could have a record that Mr. Scott had been prescribed Dilatin but Defendants, who are responsible for Mr. Scott's care and custody, had no knowledge of his condition and prescription. A jury should be permitted to determine whether the prison indeed did not have access to the same records on Mr. Scott's health that were in the possession of a third-party provider. Moreover, if Defendants failed to document a prescribed medication and serious health condition, that act of extreme disregard is in and of itself an actionable Eighth Amendment violation. *DeGidio v. Pung*, 920 F.2d 525, 529 (8th Cir. 1990) (holding that lack of "adequate organization and control in the administration of health services" would constitute an 8th Amendment violation).

(correctional officers were subjectively aware of plaintiff's serious medical need where he broadly reported that he was a heart patient and then notified them of sweating, nausea, and chest pains despite no formal diagnosis of a heart condition in plaintiff's file); *Olson v. Bloomberg*, 339 F.3d 700, 736 (8th Cir. 2003) (inmates direct report of suicidal thoughts put correctional officers on notice that he had mental health condition despite no diagnosis). Mr. Scott's self-reporting—even without the robust background of Mr. Scott's documented history of seizures while incarcerated—is sufficient to put Defendants on notice about a serious medical need. *See Kaiser Faisal Nur.*, 563 F. Supp. 3d at 958 (holding self-reporting of history of seizures would at least trigger a duty to investigate further); *Greeno v. Daley*, 414 F.3d 645, 653–654 (7th Cir. 2005) (finding that a failure to investigate the cause of incarcerated person's medical condition and the reasons why current treatment was not working could be deliberate indifference). A reasonable jury could find that Defendants knew that Mr. Scott had a seizure condition based on his documented history of seizures while in SDOC custody, the fact that anti-seizure medication was on his medication list, and that he told them that he had "epileptic problems."

In addition to Defendants' refusal to provide Mr. Scott with his seizure medication, he was also deprived of his blood pressure medication (Lisinopril and HCTZ) from October 26, 2022, until his seizure. During that time, Mr. Scott experienced dizziness, black spots in his vision, and his labs indicated that his blood pressure was "HIGH" and the provider notes included "check medication compliance" and ordered "provider BP review." Ex. B; Exhibit GG (Encounter Notes) at BATES12898. While Defendants have argued that refusing to provide Mr. Scott with his blood pressure medications was not the cause of his seizure, it could have still caused the lightheadedness, vision issues, and dizziness that he was experiencing prior to his seizure. Each of these symptoms is a clinical feature of a hypertensive crisis. Exhibit Y (Nursing

Protocols at BATES17424 (SDOC nursing protocol listing dizziness and vision changes as symptoms of a hypertensive crisis). These symptoms are sufficient to establish an Eighth Amendment claim regardless of whether they caused Mr. Scott's October 29th seizure. *Munn v. Toney*, 433 F.3d 1087, 1089 (8th Cir. 2006) (finding headaches, cramps, nosebleeds, and dizziness satisfied PLRA de minimis injury requirement). Accordingly, even if the Court were to accept Defendants' argument that they did not know Mr. Scott had a seizure condition when they failed to provide him with his seizure medication in October 2022, there should be no dispute that they are aware he had hypertension when they refused to provide him with his blood pressure medication. There is a dispute of fact as to whether withholding Mr. Scott's blood pressure medication contributed to or caused Mr. Scott's seizure. Even if withholding Mr. Scott's blood pressure medication did not cause his seizure, he suffered other actionable harm in the days between October 26th and October 29th.

### C. Defendants Deliberately Disregarded the Foreseeable Risks Associated with Depriving Mr. Scott of His Prescription Medication.

Defendants insist that they could not deliberately disregard Mr. Scott's need to be provided medication because even his doctors did not know about his seizure condition. But there is a genuine dispute of fact on this point. *See supra*,II(B). Moreover, even if Defendants did not know that withholding Mr. Scott's various medications would cause him to have a seizure, they should have been aware that he was at risk for some medical harm. *See Kahle v. Leonard*, 477 F.3d 544, 551 (8th Cir. 2007) ("a plaintiff is not required to allege and prove that the defendant … specifically knew about or anticipated the precise source of the harm") (*quoting Krein v. Norris*, 309 F.3d 487, 491 (8th Cir. 2002)). Neither corrections nor medical staff need to be able to predict the precise clinical outcomes of denying prescribed medical treatment to be liable for deliberate indifference. *See Johnson v. Hay*, 931 F.2d 456, 462 (8th Cir. 1991)

(upholding denial of summary judgment by pharmacist that decided to not fill plaintiff's seizure medication even though the specific harm that the plaintiff suffered was unknown); *Dadd*, 827 F.3d at 755 (nurse liable for withholding medication even though she did not know for certain had symptoms had persisted). They only need to be "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and [they] must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994). Obvious risks do not require an outlay of specific evidence. *Id* at 837. Notably, the Eighth Circuit has recognized there is an obvious risk denying prescribed medication. *See Phillips v. Jasper Cty. Jail*, 437 F.3d 791, 796 (8th Cir. 2006); *Majors v. Baldwin*, 456 Fed. Appx. 616, 617 (8th Cir. 2012).

In particular, denying prescribed seizure medication is a clearly established violation of the Eighth Amendment. *See Johnson*, 931 F.2d at 458. Similarly, denying prescribed blood pressure medication to a hypertensive plaintiff is a clearly established violation of the Eighth Amendment. *Haltiwanger v. Mobley*, 2000 U.S. App. LEXIS 23717 at *4 (8th Cir. 2000) (corrections staff withholding prescribed blood pressure medication when plaintiff had hypertension amounted to deliberate indifference). Defendants did not need to know that Mr. Scott would suffer a seizure because of their decision to deny him three separate prescribed medications. Because it is obvious even to lay employees that there are serious risks associated with denying a person their prescribed seizure and blood pressure medication, Defendants deliberately disregarded those risks when they failed to provide Mr. Scott with access to this treatment.

### D. Whether Withholding Medication from Mr. Scott Caused His Seizure is a Question for the Jury.

Defendants also argue that they are not liable for denying Mr. Scott his medication because the denial did not cause his seizure. They argue that depriving Mr. Scott of access to his

blood pressure medication could not have caused his seizures because he is regularly noncompliant with his blood pressure medication and does not always have a seizure. Doc. 150 at 11. There is equal evidence in the record that Mr. Scott's other seizures were triggered by medication denials—specifically his seizure on June 12, 2023, and October 11, 2023. Exhibit Y (June 12, 2023 Seizure Notes) at BATES013719 ("Patient states he had the seizure due to not being able to take his HCTZ and lisinopril this morning prior to being restrained by security staff"); Exhibit AA (Oct. 11, 2023 Seizure Notes) at BATES 8141 (discussing impact of denial of hypertension medication on Mr. Scott's seizures). Moreover, SDSP's own nursing protocols acknowledge that a history of hypertension and hypertensive encephalopathy are associated with seizures, Exhibit Y at BATES17422, not to mention the wealth of medical literature indicating that untreated hypertension can cause seizures. However, there is substantial evidence that uncontrolled hypertension can cause or contribute to a person's seizures. Exhibit X (Mayo Clinic Hypertensive Crisis). Indeed the Mayo Clinic explains that seizures are a common symptom of hypertensive crises, and that the crisis can be caused by "[f]orgetting to take blood pressure medicine *Id.* Mr. Scott's treating providers did not discount this possible explanation for his seizure in October 2022. Exhibit HH (Encounter Notes) at BATES13020. There is at a minimum a dispute of fact about whether denial of blood pressure medication caused or contributed to Mr. Scott's seizure and the question should be resolved by a jury.

Further, even if the denial of blood pressure medication did not cause Mr. Scott's seizure, there is a question as to whether it caused Mr. Scott to suffer dizziness, lightheadedness, and vision problems. *Supra*, II(B). Each of these medical complications are sufficient to state a claim for deliberate indifference. *Supra*, II(B).

Defendants failed to address whether their decision to deny Mr. Scott his prescribed seizure medication caused him to have a seizure. However, a reasonable jury could certainly find that failure to provide prescribed seizure medication led to Mr. Scott having a seizure. Accordingly, Defendants' motion should be dismissed.

### III. Defendants Retaliated Against Mr. Scott for Filing Administrative Grievances and This Lawsuit, in Violation of Mr. Scott's Clearly Established First Amendment Rights.

A plaintiff establishes a claim of First Amendment retaliation when he can "show 1) he engaged in a protected expression, 2) he suffered an adverse action, and 3) the adverse action was causally related to the protected expression." *Nelson v. Shuffman*, 603 F.3d 439, 450 (8th Cir. 2010). Defendants concede that Mr. Scott satisfied the first of these three prongs, and there are, at the very least, genuine disputes of material fact as to whether he met the second and third prongs. Accordingly, Defendants[2] are not entitled to summary judgment on Mr. Scott's First Amendment retaliation claims.

### A. Mr. Scott Engaged in Protected First Amendment Activity.

There is no dispute that Mr. Scott engaged in protected expression by filing administrative grievances and initiating this civil suit. *See* Doc. 150 at 17-20 (raising no argument as to the first element). "It is well established that the right to file a legal action is protected under the First Amendment," *Spencer v. Jackson Cty. Mo.*, 738 F.3d 907, 911 (8th Cir. 2013), as is the right to file a prison grievance, *Lewis v. Jacks*, 486 F.3d 1025, 1029 (8th Cir. 2007). Mr. Scott has proffered evidence that he was denied prison employment and housed with

---

[2] Defendants only contest Mr. Scott's individual-capacity claims against Defendants Vanderaa, Mills, and Wasko. *See* Doc. 150 at 17-20. But, pursuant to this Court's 1915A screening, Mr. Scott's individual-capacity retaliation claims against Defendants Sullivan and Swaggert and his official-capacity retaliation claims are all still live. *See* Ex. EE, Doc. 25, at 38.

dangerous inmates after he filed a grievance reporting that he suffered a grand mal seizure in October 2022 because West Hall Unit Staff denied him access to critical medications for several days. Ex. O, Doc. 1-1 at 6; *see also* Ex. P, Docs. 5 and 5-1 at 2, 5-10. Mr. Scott has further proffered evidence that this retaliatory conduct intensified after Mr. Scott filed grievances against Defendants Vanderaa and Mills for precluding him from obtaining work assignments, *see* Ex. O, Doc. 1-1 at 3-6, and after Mr. Scott filed this lawsuit, *see* Ex. U, Docs. 14 and 14-1; Ex. K, Doc. 22-1. Mr. Scott's "access to the grievance process" and to the courts "is protected under the First Amendment." *Nelson*, 603 F.3d at 450.

### B. Defendants Subjected Mr. Scott to Adverse Action by Denying Him Employment.

As a threshold issue, Defendants improperly narrow the scope of Mr. Scott's employment retaliation claims by focusing solely on his February 2023 termination from his job in the kitchen. *See* Doc. 150 at 19-20. Defendants ignore Mr. Scott's evidence that Defendants Vanderaa, Mills, Sullivan, and Wasko also denied Mr. Scott employment between November 2022 and January 2023. In November 2022, after Mr. Scott served his 10-day sanction for the M-4 violation, he regained eligibility for prison employment. Ex. O, Doc. 1-1 at 18.[3] Yet Defendants Vanderaa and Mills insisted that Mr. Scott would remain ineligible to work for *six months* following his M-4 write-up. *Id.* at 17-18; Ex. P, Doc. 5-1, at 7-8. They ignored multiple requests from the supervisor at the prison education building to hire Mr. Scott because they had,

---

[3] Defendants have not produced any DOC policies and procedures on inmate work assignments or inmate discipline that were in place from October 2022 to February 2023. But the current policy on inmate discipline, available publicly online, provides that inmates who are found guilty of M-level offenses may only have their privileges revoked for a maximum of 60 days. Ex. T, SD DOC Policy 300-17, Offender Discipline System, effective February 15, 2025, at 3-4. Mr. Scott has also proffered evidence that inmates returning from the SHU regularly receive job assignments within weeks, Ex. O, Doc. 1-1, at 18, and that SDSP staff may assign an inmate to a particular job at the request of a hiring supervisor, even if there are other inmates who have been waiting longer to receive a job assignment, *id.* at 3-4.

unjustifiably, deemed Mr. Scott ineligible for work. *Id*. Mr. Scott filed grievances about Defendant Vanderaa's and Defendant Mills's conduct, but Defendant Mills and Vanderaa were the primary reviewers of each grievance,[4] and summarily denied them. Ex. P, Doc. 5-1 at 3, 5-9. Mr. Scott sought an administrative remedy from Defendant Sullivan, who merely informed Mr. Scott that his "Unit Coordinator w[ould] continue to monitor the work list" for Mr. Scott's "opportunity to be employed." Ex. P, Doc. 5-1 at 10. Of course, Mr. Scott's Unit Coordinator was Defendant Mills—the subject of Mr. Scott's grievance to Defendant Sullivan, who Mr. Scott had alleged was underhandedly interfering with Mr. Scott's placement on the work list. Ex. P, Doc. 5-1 at 7-9.

In addition to this evidence of Defendants' earlier interference with Mr. Scott's employment, Mr. Scott has also proffered evidence that shortly after he was finally assigned work, Defendants Vanderaa and Mills fired him, with the help of Defendant Swaggert. Ex. L, Doc. 19 at 18. Mr. Scott was fired from his job in the prison kitchen on February 16, 2023—a mere five days after he filed his § 1983 suit against Defendants Vanderaa, Mills, and Swaggert, and the very same day he reported Defendant Swaggert's racial harassment. *Id*.

---

[4] Remarkably, South Dakota DOC's Grievance Procedure provides that "[s]taff who are the subject of an offender's grievance will be assigned to investigate or formally respond to that particular grievance or issue." Ex. II, SD DOC Grievance Policy, 1.3.D.07 Section IV(1)(E) at BATES 017227. This procedure contravenes widely accepted correctional standards, which mandate that individuals subject to a grievance do not participate in its review. See, e.g., Ex. JJ, National Institute of Justice, *American Jail Association Inmate Grievance Procedures* (Oct. 23, 1989) at 5 ("Rule No. 6: The grievance review process must be conducted by a person or persons who have no personal involvement in the particular grievance. Lack of impartiality destroys the grievance process and will generate contempt and distrust on the part of the prisoner population."). By design, DOC's policy—for which Defendant Wasko is responsible—both enables retaliation against inmates who file grievances and ensures that grievances are neither impartially nor thoroughly investigated.

Defendants do not dispute that they fired Mr. Scott from his kitchen job on February 16, 2023. Doc. 150 at 19-20. Instead, they insist—erroneously—that denial of prison employment cannot amount to retaliation because "[j]obs at the prison are a privilege" rather than a right. *Id.* at 20. As this Court has previously determined, Defendants' argument is foreclosed by Eighth Circuit precedent. *See* Ex. EE, Doc. 25 at 28. As the Eighth Circuit has made clear, "[t]he retaliatory conduct itself need not be a constitutional violation; the violation is acting in retaliation for the exercise of a constitutionally protected right." *Spencer*, 738 F.3d at 911 (internal quotation marks and citation omitted). Although the termination of any inmate privilege, including the opportunity to work, may "not itself be actionable under § 1983," the termination "becomes actionable if done in retaliation for the inmate's filing of a grievance" or civil suit. *Dixon v. Brown*, 38 F.3d 379, 379 (8th Cir. 1994); *see also Spencer*, 738 F.3d at 911 (holding that removal of plaintiff from prison program that made him eligible for paid job assignments could qualify as "adverse action"); *Nelson*, 603 F.3d at 450 (holding that deprivations of recreational activity and other discretionary privileges were "sufficient to support a finding of adverse action under the second prong").

Defendants' reliance on *Orebaugh v. Caspari*, 910 F.2d 526 (8th Cir. 1990), is misplaced, because unlike the incarcerated plaintiff in *Orebaugh*, Mr. Scott does not assert claims of retaliatory *discipline*. Instead, as in *Spencer*, Mr. Scott alleges retaliatory termination of employment. *See* 738 F.3d at 911. Defendants' insinuation that permitting Mr. Scott's employment retaliation claims to proceed would allow him "'to openly flout prison rules after filing a grievance'" is blatant smoke and mirrors. Doc. 150 at 20 (quoting *Orebaugh*, 910 F.2d at 528). Mr. Scott had already served his ten-day sanction for the M-4 violation when Defendants continued to deny him eligibility to work, and he was never accused of violating any prison rules

22

in connection to his February 16th firing. *See* Ex. O, Doc. 1-1 at 17-18; Ex. P, Doc. 5-1 at 7-8; Ex. L, Doc. 19 at 18.

### C. Defendants Subjected Mr. Scott to Adverse Action by Confining Him in Conditions that Posed Substantial Risk of Serious Harm.

Defendants do not dispute that they placed Mr. Scott in a cell with Inmate Larson in January 2023 and with Inmate Burton in March 2023. Doc. 150 at 18. Nor do Defendants dispute that they were aware of Larson's and Burton's violent histories and Mr. Scott's fears of physical harm. *Id*. Instead, Defendants merely argue that because Mr. Scott managed to survive his placements with Larson and Burton without getting assaulted, Defendants cannot be held accountable for putting Mr. Scott at risk of physical harm. *See id.* Defendants' argument is fundamentally flawed. As explained *supra*, I(A), Defendants cannot escape liability for placing Mr. Scott in harm's way simply because Mr. Scott happened to escape the harm.

Mr. Scott has also presented evidence that on April 4, 2023, Defendants subjected him to substantial risk of serious harm yet again when they left him in a cell contaminated by pepper spray.  Ex. M, Doc 22 at 3. As Defendants apparently concede, this, too, qualifies as "adverse action" for the purposes of a First Amendment retaliation claim. *See* Doc. 150 at 18 (acknowledging the "pepper spray residue in [Mr. Scott's] cell" as one of the bases of Mr. Scott's retaliation claims, yet making no argument on this issue). *See, e.g., Nelson*, 603 F.3d at 450 (confinement in "unfinished and inadequate ward" constitutes "adverse action").

### D. Defendants' Decisions to Deny Mr. Scott Employment Opportunities and Place Him in Cells with Dangerous Inmates and Pepper Spray Was Motivated at Least in Part by Mr. Scott's Protected Activity.

Whether a "causal connection" exists between the Plaintiff's protected activity and the Defendant's adverse action "is generally a jury question." *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004) (internal quotation marks and citation omitted). This third prong of the retaliation

analysis can only "provide a basis for summary judgment when the question is so free from doubt as to justify taking it from the jury." *Id*. Retaliatory motive and causal connection may be inferred when there is temporal proximity between the protected activity and the adverse action. *See, e.g.*, *Beard v. Falkenrath*, 97 F.4th 1109, 1121 (8th Cir. 2024) (holding that retaliatory motive could be inferred from the fact that the defendant officers began restricting the inmate's access to showers "about a week" after the inmate "formally reported" the officers for alleged misconduct); *Charleston v. McCarthy*, 8 F.4th 772, 780 (8th Cir. 2021) ("[T]emporal proximity alone may establish causation where the time lapse between the protected activity and the adverse . . . action was two months or fewer[.]"). A defendant's failure to "identify a nonretaliatory reason for their actions" also supports an inference of retaliatory motive. *Beard*, 97 F.4th at 1121; *see also Spencer*, 738 F.3d at 912 (holding that the defendant officer's failure to explain why the plaintiff was disqualified from trustee employment program created a genuine dispute as to the defendant's retaliatory motive).

Here, Mr. Scott has proffered ample evidence that Defendants denied him employment and subjected him to substantial risk of physical harm *because* he filed grievances and this lawsuit against them.

First, Mr. Scott has demonstrated that Defendants Vanderaa and Mills initially refused to assign Mr. Scott a job placement after he filed his first grievance alleging that "West Hall Unit Staff"—which includes Defendants Vanderaa, Mills, and Swaggert—delayed sending his Lisinopril and HCTZ medications to Restrictive Housing for four days, which in turn caused Mr. Scott to suffer a grand mal seizure on October 29, 2023. Ex. O, Doc. 1-1 at 6; *see also* Ex. P, Doc. 5-1 at 2, 5-10. Mr. Scott resolutely appealed Defendants' denials of an administrative remedy for this withholding of medication, contesting Defendants' claims that his medical

24

records showed he had received all his prescribed medications while in Restrictive Housing. *See, e.g.*, Ex. P, Doc. 5-1 at 5 (contesting Defendant Sullivan's assertion that Mr. Scott's medical records showed he received his medications in Restrictive Housing by alleging that "[s]omebody in Health Services lied to [Warden Sullivan] and doctored or falsified my records, or Chief Warden Sullivan is part of the lie as well").

A reasonable jury could conclude that, based on the content of Mr. Scott's grievance, which exposed West Hall Unit officers' responsibility for withholding Mr. Scott's medications, the West Hall Unit Manager and Coordinator would be motivated to retaliate against Mr. Scott. The close timing between the filing of Mr. Scott's grievance and Defendants' placement of Inmate Larson in Mr. Scott's cell and Defendants' refusal to employ Mr. Scott further supports a retaliation inference. Moreover, Defendants have not provided any evidentiary support for their claims that it was merely the length of the job waitlist—not their meddling with Mr. Scott's eligibility or refusals to place Mr. Scott on the waitlist—that caused the delays in Mr. Scott's employment. They have not produced any evidence that SDSP actually maintains a waitlist for job placements, nor any procedures governing the placement of individual inmates on the waitlist, nor any evidence of Mr. Scott's spot relative to others in any alleged waitlist. Defendants have not produced any policies or procedures governing inmate eligibility for employment or staff decisions regarding inmate work assignments. Mr. Scott's evidence shows that, to the extent any waitlist actually does exist, it either moves very quickly or Defendants regularly circumvent it for other inmates. *See, e.g.*, Ex. O, Doc. 1-1 at 1-2 (evidence that another inmate, "Yellow Boy," received a work assignment despite several alleged infractions, when a hiring supervisor asked West Unit Case Manager if "Yellow Boy" could work for him); Ex. P, Doc. 5-1 at 7 (describing Defendant Vanderaa's and Defendant Mills's refusals to assign Mr. Scott to work at

the prison school, despite multiple requests from the Senior Educator to hire Mr. Scott); Ex. O, Doc. 1-1 at 2 (hand-written note from West Unit Case Manager saying "I'm fine with you going to work, *but I didn't sanction you. I can't override Vanderaa*.") (emphasis added); *id.* at 18 (stating that other inmates have received job placements shortly after their release from the Segregated Housing Unit). Finally, Defendants have not produced any record of Mr. Scott's finding of guilt for the M-4 infraction or any record of its attendant sanctions, including any impact on his employment eligibility. Thus, there is at very least a dispute of fact as to whether Defendants imposed unauthorized, additional sanctions on Mr. Scott.

Second, Mr. Scott has also proffered sufficient evidence to support a jury's finding that Defendants fired Mr. Scott on February 16, 2023, because of his grievances and civil suit. Although Defendants claim Mr. Scott was fired because he was not satisfactorily performing his duties at work, they have not provided any evidence to support these bare and conclusory defenses. *Cf. Moore v. Plaster*, 266 F.3d 928, 932 (8th Cir. 2001) (concluding there was no evidence that inmate plaintiff was disciplined for the actual violation of a prison rule where the only record was the investigator's report, which was not based on the investigator's personal knowledge and contained only "conclusory" accusations). Further, Mr. Scott has proffered that he was never reprimanded or cited for poor performance at work, Ex. L, Doc. 19 at 18, and, to the contrary, that he regularly displayed exceptional work ethic and was uniquely qualified for his work in the kitchen, Exhibit R (Doc. 18-1) at 16, 29. In any event, Mr. Scott has presented ample evidence of Defendants' own statements suggesting their retaliatory motives. For example, Defendant Mills approached Mr. Scott on February 14, 2023—five days after he filed this lawsuit and two days before he was fired from the kitchen—and peppered him with questions about his lawsuit, "trying to pump [him] for information and bait [him]." Ex. F, Doc. 10 at 6.

When Mr. Scott asked the Kitchen Supervisor, Ms. Linda, why he had lost his job, she responded that Mr. Scott "need[ed] to go . . . focus on [his] civil case." Ex. R at 30. On March 10, 2023, as Mr. Scott was making legal copies of records in connection to this lawsuit, he asked Defendant Mills why it appeared that other inmates were able to get job placements almost immediately after their release from Segregated Housing. Ex. L, Doc. 19 at 16. Defendant Mills then "became livid" and told Mr. Scott that he was fired from the kitchen "because 'Ms. Linda did not need to hear [Mr. Scott's] complaints.'" Ex. L, Doc. 19 at 15. These statements at very least create a triable inference that Mr. Scott was fired from his kitchen job because of his "complaints" and "civil case."

Finally, Mr. Scott has proffered evidence that Defendants' decisions to place him in a cell with Inmate Burton and to leave him in a cell contaminated with pepper spray were retaliatory. Mr. Scott's evidence shows that Defendant Mills made numerous threatening comments to Mr. Scott about his civil suit throughout March 2023, close in time to when Defendants placed Burton in Mr. Scott's cell and placed Mr. Scott in a contaminated cell. For example, after Mr. Scott has proffered that, after he asked Defendant Mills for Administrative Remedy Request forms on March 1, 2023, Defendant Mills responded by stating that "he researched the First Amendment and that he did not see anything about 'Retaliation.'" Exhibit U, (Doc. 14 and 14-1) at 1. Mr. Scott's evidence shows that Defendant Mills continued to ask questions about this lawsuit, in an increasingly "heated and aggressive" manner, while questioning "the validity of [Mr. Scott's] grievances and civil case." *Id*. Later that same day, Defendant Mills called Mr. Scott into his office, where he had the text of the First Amendment pulled up on his computer, and "kept putting pressure on" Mr. Scott to explain where he was obtaining his legal advice and

information about the First Amendment. *Id*. Mr. Scott has continued to endure similar encounters. *See, e.g.,* Ex. L, Doc. 19 at 15.

Because there are genuine disputes of fact as to whether Defendants had retaliatory motive when they denied Mr. Scott employment and placed him in cells with dangerous conditions, they are not entitled to qualified immunity on these claims. *See, e.g.*, *Spencer*, 738 F.3d at 913 (reversing grant of qualified immunity to prison officials because there was "a genuine issue of material fact as to whether . . . [the officials] were motivated at least in part by [the plaintiff's] attempts to use the grievance procedure" when they revoked his eligibility for prison employment); *Beard v. Falkenrath*, 97 F.4th 1109, 1120 (8th Cir. 2024) (citing *Spencer* for the proposition "that there can be no qualified immunity if retaliation, rather than some other legitimate justification, was the reason for the denial of [the plaintiff's] promotion" out of administrative segregation and access to showers).

### IV.    Defendants Violated Mr. Scott's Clearly Established Equal Protection Rights.

Defendants claim that prison officials have a constitutional carte blanche to racially harass Mr. Scott and cause him to be fired when he brings up race. But that is not the case. The Equal Protection clause prohibits racial harassment, and the presence of certain aggravating circumstances can make a single slur or epithet actionable. *Ellis v. Houston*, 742 F.3d 307, 319-20 (8th Cir. 2014) (noting claims of racial harassment under the Fourteenth Amendment must be examined as a whole). Further, denying a Black inmate access to employment opportunities in prison is a classic equal protection violation. *Black v. Lane*, 824 F.2d 561, 562 (7th Cir. 1987).

A single racially offensive interaction can be sufficient to state an Equal Protection claim if the circumstances make the incident severe enough to create a hostile environment. *Ellis v. Houston*, 742 F.3d 307, 325-26 (8th Cir. 2014) ("[p]erhaps no single act can more quickly alter

the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates") (*quoting Rodgers v. W-S Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993)). One such aggravating factor is the existence of a power differential—which is particularly pronounced when the harasser is a corrections officer and the victim is an inmate. *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 580 (D.C. Cir. 2013) (Kavanaugh, J., concurring) ("[I]n my view, being called the n-word by a supervisor—as [plaintiff] alleges happened to him—suffices by itself to establish a racially hostile work environment."). Here, Defendant Swaggert insulted, taunted, and used racial slurs against Mr. Scott while he was working. His power over Mr. Scott—including his power to withhold medication from him, use force against him, initiate actions that would take away his good time credits, and put disciplinary charges on him—all made this racial interaction more severe. A reasonable jury could find that Defendant Swaggert's conduct—particularly the use of a slur—was sufficiently severe to violate the Fourteenth Amendment.

There is no dispute that Mr. Scott was fired the same day Swaggert racially harassed him and he complained about it. Defendants produced a pretextual reason for Mr. Scott's termination—i.e. he could not perform his work as instructed. However, this is usually what racially discriminatory terminations look like as a defendant will rarely admit that they fired someone because of their race. *See Rothmeier v. Inv. Advisers, Inc.*, 85 F.3d 1328, 1332 (8th Cir. 1996) ("a 'smoking gun' case in arena of discrimination is rare") (*citing U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983) (noting that "[t]here will seldom be 'eyewitness' testimony as to the employer's mental processes"). Instead, circumstantial evidence is typically relied upon to prove an action is racially motivated. Circumstantial evidence can include racially tinged statements by decision makers, the sequence and proximity of events leading up to the

challenged action, statistics, and historical events. *Mensie v. Little Rock*, 917 F.3d 685, 689 (8th Cir. 2019).

Here, there is ample evidence that Mr. Scott was terminated for racially motivated reasons—in particular, being a Black man who objected to racism. First, Mr. Scott was fired the same day he was racially harassed and objected to it. Ex. R, Doc. 18-1 at 29-30. Rarely is there such a clear temporal connection between a racialized event and an adverse consequence. Second, when Mr. Scott complained about the racial harassment—shortly before his termination—his supervisor told him to not make things about race and play the race card. *Id.* at 32.[5] These statements in addition to Swaggert's initial comments add to circumstantial evidence that Mr. Scott was terminated for racially motivated reasons. Moreover, Defendants have failed to provide evidence in support of their claim that Scott was fired for the race-neutral reason of "not performing his work as assigned." Mr. Scott was never charged with any offense relating to failure to work, nor was he written up or reprimanded for any alleged problems at work. See Ex. L, Doc. 19 at 18; *see also* https://www.doc.sd.gov/home/showpublisheddocument/1356/638762470904970000 at 5 (listing "refusal to work" as a disciplinary offense). In contrast, Mr. Scott has proffered evidence that he was an exemplary employee in the kitchen and was well qualified for the job—he even had specialized certifications in nutrition and food service. Doc. 18-1 at 29.

Further, all of these actions happened against the backdrop of SDSP's history of racially disparate treatment. *See, e.g.,* Exhibit CC (ACLU ORR data on racial disparities in restrictive

---

[5] Plaintiff acknowledges that Linda Sullivan is not a defendant but her comments are nonetheless relevant to Mr. Scott's allegation that she fired Mr. Scott at Defendant Swaggert's direction.

housing); Exhibit BB (EEOC investigations into staff racial harassment). There is sufficient record evidence for a reasonable jury to find Mr. Scott's termination was racially motivated.

With respect to the claims against Defendant Wasko, Mr. Scott can state a claim by demonstrating a supervisor has failed to correct unconstitutional policies, practices, or conditions. *See Johnson v. Lockhart*, 941 F.2d 705 (8th Cir. 1991). Here, there have been rampant issues of racial harassment and racially disparate treatment in SDSP prior to February 2023 when Mr. Scott was racially harassed and then terminated for racially motivated reasons. Accordingly, a reasonable jury could find that Defendant Wasko should face supervisory liability for the violations of Mr. Scott's clearly established Equal Protection rights.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully asks the Court to deny Defendants' motion for summary judgment in its entirety.

Dated this 2nd day of September, 2025.

/s/ Brent W. Matter
Brent W. Matter
MATTER LAW OFFICE, PROF. LLC
PO Box 335
12 Church Street
Vermillion, SD 57069
(605) 624-4262
bwmatter@matterlawoffice.com
*Attorney for Plaintiff*

**NATIONAL POLICE
ACCOUNTABILITY PROJECT**

Lauren Bonds* KS #27807
1403 Southwest Boulevard
Kansas City, Kansas 66103
(620) 664-8584
legal.npap@nlg.org
*Attorney for Plaintiff*
*Admitted Pro Hac Vice

31