UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| LA'SHANE DONYALE SCOTT,<br><br>Plaintiff,<br><br>vs.<br><br>DR. MARY CARPENTER, Former Chief Medical Official, individual capacity; WARDEN DAN SULLIVAN, Former Chief Warden of South Dakota State Prisons, individual capacity; RYAN VANDERAA, Unit Manager West Hall, individual and official capacities; JASON MILLS, Unit Coordinator, West Hall, individual and official capacities; SGT. SWYGERT, Officer in Charge, individual capacity; OFFICER GENGLER, Correctional Officer, individual capacity; KAYLA TINKER, Health Services Official, individual and official capacities; CHARGE NURSE STEPHANIE MEINDERS, Charge Nurse Health Services, individual capacity; UNKNOWN OFFICERS, Correctional officers that worked in the West Hall Unit, the "SHU" from 10/26/2022 to 10/30/2022, individual and official capacities; UNKNOWN HEALTH SERVICES NURSING STAFF, Correctional nursing staff that worked in the Segregated Housing Unit from 10/26/2022 to 10/30/2022, individual and official capacities; KELLIE WASKO, Former Secretary of the Department of Corrections, individual capacity; JOSEPH ROEMMICH, Warden, official capacity; DR. AARON HAYNES, official capacity; and NICK LAMB, Secretary of the Department of Corrections, official capacity,[1] | 4:23-CV-04020-RAL<br><br><br>OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

---

[1] Scott brings claims official capacity claims for injunctive relief against Kellie Wasko, the former Secretary of the Department of Corrections. Under Federal Rule of Civil Procedure 25(d), "[a]n action does not abate when a public official who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is

| Defendants. | |
|---|---|
| | |

Plaintiff La'Shane Donyale Scott, an inmate at the South Dakota State Penitentiary, filed a pro se civil rights lawsuit under 42 U.S.C. § 1983. Doc. 1; Doc. 15-1. Defendants filed a motion for summary judgment. Doc. 149. Scott then obtained counsel, see Doc. 155, and this Court extended Scott's time to respond to Defendants' motion for summary judgment to permit his newly retained counsel time to familiarize himself with this matter and to review the discovery that had been produced. Doc. 157. Scott, through his counsel, opposes Defendants' motion for summary judgment. See Docs. 165, 169, 170.

## I.    Procedural History and Remaining Claims

Six claims in Scott's complaint and amended complaint survived screening. See generally Doc. 25. This Court begins with a summary of Scott's pending claims:

- Eighth Amendment deliberate indifference to serious medical needs claim against Dr.

    Carpenter, Sullivan, Swygert,[2] Gengler,[3] Tinker, Charge Nurse Stephanie Meinders,[4]

---

automatically substituted as a party." Fed. R. Civ. P. 25(d). Nick Lamb, the current Secretary of the Department of Corrections, is automatically substituted for Wasko on Scott's official capacity claims.

[2] Scott's initial complaint identified this defendant as Sgt. Swaggert, and the parties' summary judgment submissions use this spelling. The correct spelling of this defendant's last name is Swygert. Doc. 51 at 2. This Opinion and Order uses the correct spelling. Scott sued Swygert in his individual and official capacities, but Swygert is no longer employed by the SDSP. Doc. 56 at 1–3. Scott's official capacity claims against Swygert are dismissed as moot.

[3] Scott's initial complaint identified this defendant as Gangler, and the parties' summary judgment submissions use this spelling. The correct spelling of this defendant's last name is Gengler. Doc. 55 at 3. This Opinion and Order uses the correct spelling. Scott sued Gengler in his individual and official capacities, but Gengler is no longer employed by the SDSP. Doc. 48 at 3. Scott's official capacity claims against Gengler are dismissed as moot.

[4] Scott's initial complaint identified this defendant as Charge Nurse Stephanie, and the parties' summary judgment pleadings use this description. This defendant's full name is Stephanie

Unknown Health Services Leadership, Unknown Officers and West Hall Unit Staff, and Wasko in their individual capacities for money damages.[5]  Doc. 25 at 37.

- Eighth Amendment deliberate indifference to conditions-of-confinement claim regarding the placement of inmate Larson in Scott's cell against Sullivan, Vanderaa, Mills, and Wasko in their individual capacities for money damages. Id.

- Eighth Amendment deliberate indifference to conditions-of-confinement claim regarding the placement of inmate Burton in Scott's cell and a pepper spray residue incident against Wasko in her individual capacity for money damages. Id.

- First Amendment retaliation claim against Sullivan, Vanderaa, Mills, Swygert, and Wasko in their individual capacities for money damages. Id. at 38.

- Fourteenth Amendment equal protection claim against Swygert and Wasko in their individual capacities for money damages. Id.

- Scott's official capacity claims for injunctive relief on his Eighth Amendment deliberate indifference to condition-of-confinement claims and his First Amendment retaliation claims survived. Id.

---

Meinders. Doc. 51 at 2. Scott sued Charge Nurse Stephanie Meinders in her individual and official capacities, but Meinders is no longer employed by the SDSP. Doc. 151 ¶ 10; Doc. 170 ¶ 10. Scott's official capacity claims against Meinders are dismissed as moot.
[5] Scott's Eighth Amendment deliberate indifference to serious medical needs claim against "Nurse Lana" survived screening. Doc. 25 at 37. But Scott never served this defendant, who was later correctly identified as Nurse Lonna Koglin, and Scott's claims against this defendant were dismissed without prejudice pursuant to Fed. R. Civ. P. 4(m). Doc. 51 at 2; Doc. 154 at 6–7.

## II.     Facts[6]

Scott responded to Defendants' statement of undisputed material facts as required by D.S.D. Civ. LR 56.1. See Doc. 170 at 2–15 (¶¶ 1–86). Scott's response, which is titled, "Plaintiff's Opposing Statement of Facts and Additional Material Facts," includes a section of 80 separately numbered paragraphs that Scott refers to as "Statement of Additional Material Facts." See id. at 15–22 (¶¶ 1–80). Because one pleading contains duplicate paragraph numbers, this Court will cite Scott's response to Defendants' statement of undisputed material facts, Doc. 170 at 2–15 (¶¶ 1–86), as "Doc. 170" followed by the appropriate paragraph number. This Court will cite Scott's "Statement of Additional Material Facts," Doc. 170 at 15–22 (¶¶ 1–80) as "SAMF" followed by the appropriate paragraph number. Defendants did not respond paragraph by paragraph to Scott's "Statement of Additional Material Facts," but neither the Federal Rules of Civil Procedure nor the Local Rules require that they do so.

### A.     The Parties

Plaintiff La'Shane Donyale Scott is an inmate in the custody of the South Dakota Department of Corrections (DOC) and, at all relevant times, has been incarcerated at the South Dakota State Penitentiary (SDSP) in Sioux Falls, South Dakota. Doc. 151 ¶ 1; Doc. 170 ¶ 1. Defendant Dr. Mary Carpenter was employed by the DOC as the Chief Medical Officer. Doc. 151 ¶ 2; Doc. 170 ¶ 2. Defendant Dan Sullivan was employed as the Warden of the SDSP. Doc. 151 ¶ 3; Doc. 170 ¶ 3. Defendant Ryan Vanderaa is employed by the DOC as a unit manager at the SDSP. Doc. 151 ¶ 5; Doc. 170 ¶ 5. Defendant Jason Mills is employed by the DOC as a unit

---

[6] This Court takes the facts primarily from those portions of Defendants' statement of material facts that Scott does not dispute. For the portions Scott properly disputes, this Court cites to both parties' versions and is mindful that genuine disputes of material facts are resolved at the summary judgment stage in Scott's favor.

coordinator at the SDSP. Doc. 151 ¶ 6; Doc. 170 ¶ 6. Defendant Sgt. Swygert was employed by the DOC as an officer in charge at the SDSP. Doc. 151 ¶ 7; Doc. 170 ¶ 7. Defendant Officer Gengler was employed by the DOC as a correctional officer at the SDSP. Doc. 151 ¶ 8; Doc. 170 ¶ 8. Defendant Kayla Tinker is employed by the DOC as a health service official at the SDSP. Doc. 151 ¶ 9; Doc. 170 ¶ 9. Defendant Charge Nurse Stephanie Meinders was employed by the DOC as a charge nurse at the SDSP. Doc. 151 ¶ 10; Doc. 170 ¶ 10. Defendant Kellie Wasko was employed as the South Dakota Secretary of Corrections. Doc. 151 ¶ 13; Doc. 170 ¶ 13.

### B.    Scott's Medical History

#### 1.    October 25, 2019 Seizure

Scott first experienced a documented seizure event while in DOC custody on October 25, 2019. Doc. 151 ¶ 14; Doc. 170 ¶ 14. At 10:31 a.m. on October 25, 2019, Scott was seen by health services for assessment before being admitted to the Special Housing Unit ("SHU"). Doc. 151-2; Doc. 151 ¶ 15; Doc. 170 ¶ 15. Scott's prescription medication list at the time of this assessment included 25 mg of HCTZ and 20 mg of Lisinopril. Doc. 151-2; Doc. 151 ¶ 16; Doc. 170 ¶ 16.

On November 6, 2019, health services again evaluated Scott for placement in sheltered housing. Doc. 151-3; Doc. 151 ¶ 17; Doc. 170 ¶ 17. On October 19, 2019, Scott had sustained a broken jaw, and his jaw was wired shut. Doc. 151 ¶ 17; Doc. 170 ¶ 17. At the time of the November 6, 2019 assessment, the provider noted that Scott "was evaluated in the ER October 25, 2019 after seizure like activity noted to have blood sugar of 68 which was felt to be responsible for his altered status at the time." Doc. 151-3; Doc. 151 ¶ 17; Doc. 170 ¶ 17. The November 6, 2019 assessment also states that "[i]t was felt . . . his blood sugar was low due to decreased PO intake related to recent mandible fracture which has since been repaired." Doc. 151-3; Doc. 151 ¶ 17; Doc. 170 ¶ 17.

5

### 2.    October 29, 2022 Health Event

Following an altercation[7] with another inmate, Tristin Larson, on October 26, 2022, Scott was transferred to the SHU. SAMF ¶ 6. Scott was housed in the SHU from October 26 through October 29, 2022. Doc. 151 ¶ 21; Doc. 170 ¶ 21. Immediately before he was placed in the SHU on October 26, 2022, Scott was taking several medications. Doc. 151 ¶ 26; Doc. 170 ¶ 26. Health services staff administered some of Scott's medications, but the rest of the medications were designated as Keep on Person, or KOP, meaning that Scott kept those medications in his cell and self-administered them. Doc. 151 ¶ 26; Doc. 170 ¶ 26. When Scott was placed in the SHU on October 25, 2022, he had been prescribed Lisinopril and HCTZ to treat hypertension. Doc. 151 ¶ 28; Doc. 170 ¶ 28. Lisinopril and HCTZ were designated as KOP, meaning that Scott kept those medications in his cell and self-administered them. Doc. 151-13 at 3–5. It is undisputed that Scott did not receive his Lisinopril and HCTZ on October 27, 28, or 29, while he in the SHU. Doc. 151 ¶ 27; Doc. 170 ¶ 27. The parties dispute whether Scott received all prescribed doses of Lisinopril and HCTZ on October 26, 2022. Doc. 151 ¶ 27; Doc. 170 ¶ 27.

While Scott was in the SHU, he reported to Gengler that he was not feeling well, was lightheaded, and needed his medications. Doc. 170 ¶ 19 (citing Doc. 165-1 (Ex. B., Doc. 3 at 1)). According to Scott, Gengler responded "that it must have been all of the 'Hennessy' that [he] use [sic] to drink that had the room spining [sic] . . . and he laughed[.]" Doc. 10 at 2. There is also evidence that Scott continually requested that Swygert, the officer in charge, come to the SHU to address Scott's requests for his medications, but Swygert "never showed up but was informed[.]" Doc. 165-1 (Ex. B., Doc. 3 at 1); Doc. 10 at 3. On October 29, 2022, Scott laid down because he

---

[7] Scott contends that Larson initiated the altercation and "assaulted" him. SAMF ¶¶ 1, 5 (citing Doc. 165-6 at 1).

6

felt sick and dizzy, but before he laid down, he asked a correctional officer, who is not a named defendant, to "put a serious rush" on his Lisinopril and HCTZ. Doc. 10 at 3. Scott overheard the correctional officer call Swygert, the officer in charge, but Swygert did not come to the SHU. Id.

At around 9:00 p.m. on October 29, 2022, Scott did not respond when correctional officers called his name. Doc. 3 at 2. The officers called a "code red" and stated that "it looks like he's having a seizure[.]" Id. When a nurse arrived at Scott's cell, Scott was on his back, actively seizing, and struggling to breath. Doc. 151-15 at 7. Scott was transported by ambulance to the hospital. Id. at 1, 10.

Scott contends that he filed a grievance in early November 2022[8] about West Hall Unit staff refusing to pack up and send to the SHU his KOP medications on October 26, 2022. SAMF ¶ 14. The grievance alleged that the grand mal seizure Scott suffered on October 29, 2022, was the result of his days-long denial of his blood pressure medications. Id. The grievance also alleged that Swygert, the West Hall Unit Officer-in-Charge, ignored multiple communications from health services and SHU officers reporting Scott's pre-seizure symptoms and requesting the urgent transfer of Scott's medications. Id.

Defendants contend that Scott has a history of failing to take his KOP medications, particularly the Lisinopril. Doc. 151 ¶ 18. Defendants argue, without citing to any record evidence, that if these medications were medically necessary they would not be KOP, and that if missing a few doses of these medications caused seizure-like symptoms, Scott would have suffered these symptoms more often because of his noncompliance. Doc. 150 at 11.

---

[8] The Court notes that the documents Scott references in support of this statement of additional material fact are dated later than November 2022, but the cited documents are consistent with the content of the grievance as reflected in this paragraph. See Doc. 165-16 at 5–6; Doc. 165-17 at 4, 5, 8.

### C.    Scott's Attempt to Obtain Employment

Following his altercation with Larson, correctional officers, including Officer Boysen, transported Scott to the SHU. SAMF ¶ 6. Scott was charged with an M-4 offense for threatening Officer Boysen during transport to the SHU and referred for placement in Restrictive Housing as punishment for the M-4 offense. Id. ¶ 9. After an administrative hearing on Scott's referral to restricted housing, the Hearing Board voted not to place Scott in Restrictive Housing. Id. ¶ 11. Scott received a 10-day sanction for the M-4 violation, but he was not sanctioned because of his altercation with Larson. Id. ¶¶ 13, 17. When Scott returned to his unit from the SHU, Vanderaa, the unit manager, informed him that he would be ineligible for prison employment for an additional six months. Id. ¶ 15. DOC policy provides that inmates who are found guilty of M-level offenses may have their privileges revoked for a maximum of 60 days. Id. ¶ 16.

In early January 2023, according to Scott, the hiring supervisor at the prison education building emailed Vanderaa and requested to hire Scott, but Vanderaa denied the request. Id. ¶ 21. According to Scott, Vanderaa said that Scott needed to wait for six months before he would be put on a job wait list. Doc. 165-16 at 17. Vanderaa then told Scott that he "should not be fighting people and that in his world that doesnt [sic] happen." Id. Scott contends that other inmates returning from the SHU regularly receive job assignments within weeks. SAMF ¶ 20. On January 29, 2023, Scott sent a kite to an officer who is not named as a defendant requesting assistance in obtaining employment. Id. ¶ 32. That officer responded that he was fine with Scott going to work, "but [he] didn't sanction [Scott]. [He] can't override Vanderaa." Doc. 165-16 at 3–4. Finally, Scott contends that Mills initially informed Scott that if he wanted a job, Scott should kite him, but when Scott did so, Mills responded that he did not have to give Scott a job. Doc. 5-1 at 7.

Defendants consider jobs at the prison to be a privilege assigned by unit staff.  Doc. 151 ¶ 64.  No inmate has a right to work in any particular job or assignment.  Id. ¶ 62.  Inmates are subject to transfer to another job or removal from any job assignment at the discretion of the employer, supervisor, or Warden.  Id. ¶ 63.

D.     Scott's Placement with Inmate Larson

In January 2023, Tristin Larson, the inmate with whom Scott had an altercation on October 26, 2022, received placement to share Scott's cell for approximately three weeks.  Doc. 151 ¶¶ 30, 32; Doc. 170 ¶¶ 30, 32.  Scott contends that Larson had initiated the prior altercation and "assaulted" him.  SAMF ¶¶ 1, 5 (citing Doc. 165-6 at 1).  During the time when Larson and Scott were housed together, there were no altercations, and Scott does not contend that Larson harmed him or attempted to harm him when they were housed in the same cell.  Doc. 151 ¶ 41; Doc. 170 ¶ 41.  In a supplement to his complaint, Scott states that "[t]he inmate that I had originally got into the altercation with 'Mr. Larson' was placed into my cell as my cell mate, and he is probably the best cell mate that I have had in almost the 13-years of being incarcerated[.]"  Doc. 1-1 at 18.

In his amended complaint, Scott alleges that Vanderaa and Mills placed Scott in a cell with Larson knowing that Larson had assaulted him on October 26, 2022, despite protests from Officer Dekam.  Doc. 15-1 at 4–5 (proposed amended complaint); Doc. 27 at 4–5 (amended complaint).  But Scott's amended complaint is not verified.  See Doc. 15-1; Doc. 27.  In his initial complaint, Scott alleges that Sullivan "ignored [his] complaints about [his] safety when putting a dangerous inmate into [his] cell[.]"  Doc. 1 at 8.  Scott also alleges in his initial complaint that "all of these acts fall into [Wasko's] hands and leader ship[sic]" and that he has "informed her of everything that has occurred and transpired."  Id. at 13.  Scott's initial complaint is not verified.  See id. at 24.

E.    **Scott's Placement with Inmate Burton**

On March 20, 2023, Burton received placement to share a cell with Scott. Doc. 165-13 at 24. Scott's informal resolution request, was dated March 20, 2023, and received by Mills, contends that Burton suffers from "mental health issues" and "has a[n] extreme history of assaults on his prior cell mates and officers." Id. (capitalization in original omitted). According to Scott, he reported his fears to unit staff and officers, but his concerns "fell upon deaf ears[.]" Id. (capitalization in original omitted). Id. In a request for administrative remedy, Scott contended that he reported his concerns about Burton to DeKam, Yost, and Sorenson. Doc. 22-1 at 6. Specifically, he recalls telling DeKam that Burton was "unstable and out of control[.]" Id.; Doc. 151 ¶ 75; Doc. 170 ¶ 75.

On March 20, 2023, Burton informed a correctional officer, who is not a named defendant, that he was not getting along with Scott and did not want to be placed in Scott's cell. Doc. 151 ¶ 72; Doc. 151-18; Doc. 170 ¶ 72. The correctional officer informed Burton that he did not have any option other than sharing Scott's cell and filling out a request to move or returning to the SHU for refusing a housing placement. Doc. 151-18. Burton advised the correctional officer that he was going to go back to Scott's cell and wait to be moved. Doc. 151 ¶ 73; Doc. 151-18; Doc. 170 ¶ 73. When the correctional officer informed Scott that Burton was going to submit a room change request, Scott informed the correctional officer "that he was concerned of Burton's violent past and if somebody ended up dead it wouldn't be his fault." Doc. 151-18.

On March 23, 2023, Scott was informed that cell assignments are determined by the unit team and are required to follow AIMS and PREA guidelines and that if he felt he was in danger of being physically assaulted or abused, he should report his concerns to a staff member immediately. Doc. 151 ¶¶ 76, 77; Doc. 170 ¶¶ 76, 77. Prisoners who want to change cell assignments may

submit a room change request to the unit team for consideration. Doc. 151 ¶ 78; Doc. 170 ¶ 78. There is no evidence that Scott submitted a room change request after he was advised that he could do so on March 23, 2023. Doc. 151 ¶ 80; Doc. 170 ¶ 80.[9] Scott and Burton were never involved in any verbal or physical altercation. Doc. 151 ¶¶ 47, 79; Doc. 170 ¶¶ 47, 79. Scott did not report any incidents with Burton during the time that they were housed in the same cell. Doc. 151 ¶ 71; Doc. 170 ¶ 71.

In Scott's complaint, he alleges that Sullivan "ignored [his] complaints about [his] safety when putting a dangerous inmate into [his] cell[.]" Doc. 1 at 8. Scott's complaint is not verified. See generally Doc. 1.

F.     Residual Pepper Spray

On April 4, 2023, Scott was housed in a cell where pepper spray allegedly had previously deployed. Doc. 22 ¶ 13; Doc. 151 ¶ 51; Doc. 170 ¶ 51. Scott contends that pepper spray can trigger seizures which include migraine headaches, blurred vision, and stomach pains. Doc. 22 ¶ 14. Shortly after he was placed in the cell, Scott pressed the emergency call button to alert "officers and health services staff" that he felt the symptoms of a seizure coming on. Id. ¶ 15 (capitalization in original omitted). When an officer responded, Scott was administered his prescribed anti-seizure medication. Id.

On April 9, 2023, "unit staff" and "officers" granted Scott permission to "do a major cell wall clean" to remove any pepper spray residue. Id. ¶ 16 (capitalization in original omitted); Doc. 151 ¶ 52; Doc. 170 ¶ 52. Approximately forty minutes after Scott began to clean, a correctional

---

[9] Scott disputes that he did not submit to his unit team a room change request. Doc. 170 ¶ 80. But the record evidence Scott cites does not demonstrate that he "pursued formal and informal remedy processes at the prison *to try to change cellmates.*" Id. (emphasis added). Only Exhibit K references Burton, but in that document Scott does not request a room change. Doc. 165-12 at 6–7.

officer, who is not a named defendant (DeKam), removed the cleaning supplies. Doc. 22 ¶ 17; Doc. 151 ¶ 55; Doc. 151-19 at 1–2; Doc. 170 ¶ 55. Scott submitted a grievance contending that he was being harassed by unit staff and other officers because he had not been permitted to finish cleaning his cell.[10] Doc. 22 ¶ 18; Doc. 151 ¶¶ 53, 54; Doc. 151-19 at 1–2; Doc. 170 ¶¶ 53, 54. Scott was advised that inmates are not permitted to have mops and buckets in their cells and that the correctional officer who had removed the mop and bucket was not harassing him but was enforcing the sanitation standards in the West Hall Unit Plan. Doc. 151-19 at 1–2.

## G.    Alleged Racial Slurs, Taunting, and Termination

Scott was working in the kitchen on February 16, 2023,[11] and wearing his "all black religious, Muslim Kufi[.]" Doc. 9 at 1–2. Scott contends that Sgt. Swygert approached him and asked "'why am I so mad,' in a sarcastic taunting manner." Id. at 2. Scott responded that "I am black and that this is my natural look." Id. According to Scott, Swygert then stated, "'you said it not me.'" Id. Scott contends that he responded that "'[y]ou were probably thinking it otherwise we would not be having a conversation.'" Id. Swygert, Scott asserts, "smiled at [him] sheepishly and walked off[.]" Id. Scott immediately reported this encounter to Warden Ponto, Chief Warden Sullivan, as well as others, including "Kitchen Supervisor Linda[.]" Id.; Doc. 27 at 3 ("I told Defendant Warden Sullivan, about the racial comments and conduct of Defendant Sgt. Swaggert and I was later terminated from work, out of Retaliation."). Scott claims that the same day "Ms. Linda" terminated Scott because he "was the one being racial and . . . needed to focus on his civil case." Doc. 9 at 2.

---

[10] In Scott's grievance, he did not allege that he had a serious medical need or health risk that was being ignored. Doc. 151-19 at 1–2.

[11] According to Scott's declaration, he got a job in the kitchen after an inmate worker shortage caused by lockdowns at the SDSP. Doc. 10 at 5.

12

According to Scott, when he complained about the alleged taunting, he was terminated from his position working in the kitchen. Doc. 151 ¶ 83; Doc. 170 ¶ 83. Following his termination, Scott submitted a grievance. Doc. 151-20 at 2. When Mills responded to Scott's grievance, Mills informed Scott that based on Mills's discussion with kitchen supervisor Linda, Scott has been terminated because he was unable to perform the work as instructed. Id.; Doc. 151 ¶ 59; Doc. 170 ¶ 59.

Scott submitted a request for administrative remedy claiming that Mills told him that he had been fired from the kitchen due to reporting a conversation with Swygert. Doc. 151-20 at 2; Doc. 151 ¶ 84; Doc. 170 ¶ 84. Vanderaa responded to Scott's request for administrative remedy and stated:

> After speaking with the individuals involved, it was determined that you were fired from your job in the kitchen because you were not performing the job correctly. It was also determined that the staff member did not make any racial comments or harass you.

Doc. 151-20 at 1; Doc. 151 ¶¶ 85, 86; Doc. 170 ¶¶ 85, 86. Scott disputes the truth of the official response recorded in Scott's "Offender Issues Report," Doc. 151-20. Doc. 170 ¶¶ 85, 86. According to Scott, "Defendants have not produced a record of any supposed investigation nor have they produced any evidence upon this 'determination' supposedly rests." Id. According to Scott, Linda, the kitchen supervisor, told him that he was fired because he "need[ed] to go . . . focus on [his] civil case." Id. ¶ 86 (quoting Doc. 165-19 at 30). But the request for administrative remedy Scott quotes states only that Linda told him that "he was being a racist and that [he] needed to focus on [his] civil case" when Scott "spoke up" about racist jokes or comments made by other inmates and prison staff, including Swygert. Doc. 165-19 at 30.

## III.    Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56(a) places the burden initially on the moving party to establish the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. Id.; see also Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). Once the moving party has met that burden, the nonmoving party must establish that a material fact is genuinely disputed either by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A), (B); Gacek v. Owens & Minor Distrib., Inc., 666 F.3d 1142, 1145–46 (8th Cir. 2012); see also Mosley v. City of Northwoods, 415 F.3d 908, 910 (8th Cir. 2005) (stating that a nonmovant may not merely rely on allegations or denials). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials in his pleading, but must set forth specific facts showing that there is a genuine issue for trial. Gacek, 666 F.3d at 1145. In ruling on a motion for summary judgment, the facts and inferences fairly drawn from those facts are "viewed in the light most favorable to the party opposing the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam)).

## IV.    Analysis

### A.    Qualified Immunity

Section 1983 provides a cause of action against any "person" who, acting "under color of" state law, deprives the plaintiff of "rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983. Claims based on vicarious liability are not cognizable under 42 U.S.C. § 1983.

14

Marsh v. Phelps Cnty., 902 F.3d 745, 754 (8th Cir. 2018). "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Id. (alteration in original) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009)); Jones v. City of St. Louis, 104 F.4th 1043, 1050 (8th Cir. 2024). In other words, "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." Marsh, 902 F.3d at 754 (quoting Ashcroft, 556 U.S. at 677).

The doctrine of qualified immunity is a defense available to state officials sued in their individual capacities under § 1983. This doctrine "shields a government official from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." Partlow v. Stadler, 774 F.3d 497, 501 (8th Cir. 2014) (citation omitted). Courts use a two-step inquiry to determine whether qualified immunity applies: "(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." Id. A plaintiff must meet both steps to defeat qualified immunity, and courts can begin (and perhaps end) with either step. Greenman v. Jessen, 787 F.3d 882, 887 (8th Cir. 2015). Defendants argue that they are entitled to qualified immunity on Scott's individual capacity claims for money damages because Scott has not demonstrated a violation of a clearly established constitutional right. Doc. 150 at 6–7.

The parties, for the most part,[12] do not argue why each Defendant should or not should be found liable based on his or her personal involvement. See generally Docs. 150, 151, 169, 170,

---

[12] In their Reply Brief, Defendants discuss whether individual Defendants were deliberately indifferent to a serious medical need. Doc. 176 at 10–15.

15

176. Instead, the parties discuss the conduct of all Defendants collectively and argue that all Defendants collectively should or not should not be found liable.

The United States Court of Appeals for the Eighth Circuit has instructed that "[w]hen there are multiple defendants who played limited roles in the conduct complained of, the determination whether an individual defendant is entitled to qualified immunity is based upon that defendant's knowledge and conduct at the time or times he or she participated in that conduct." Cannon v. Dehner, 112 F.4th 580, 586 (8th Cir. 2024). When considering whether each Defendant is entitled to qualified immunity, this Court will first assess whether Scott has identified any competent record evidence that each Defendant named in his claims had any personal involvement in the alleged unconstitutional conduct. If there is no such evidence, then that Defendant is entitled to summary judgment as a matter of law on Scott's § 1983 claim. If Scott has identified competent record evidence that a named Defendant had personal involvement in the alleged unconstitutional conduct, then the Court will determine whether that Defendant is entitled to qualified immunity based on the record evidence reflecting that specific Defendant's knowledge and conduct as the time or times he or she participated in that conduct.

"When a supervising official who had no direct participation in an alleged constitutional violation is sued for failure to train or supervise the offending action, the supervisor is entitled to qualified immunity unless plaintiff proves that the supervisor (1) received notice of a pattern of unconstitutional acts committed by a subordinate, and (2) was deliberately indifferent to or authorized those actions." S.M. v. Krigbaum, 808 F.3d 335, 340 (8th Cir. 2015) (citing Livers v. Schenck, 700 F.3d 340, 355 (8th Cir. 2012)). The Eighth Circuit has described this "a rigorous standard" requiring that "the supervisor had notice of a pattern of conduct by the subordinate that violated a clearly established constitutional right." Id.

16

"Under § 1983, a claim for failure to supervise requires the same analysis as a claim for failure to train." Atkinson v. City of Mountain View, 709 F.3d 1201, 1216 (8th Cir. 2013) (citation modified). To maintain a § 1983 claim for failure to train or supervise, at this stage of the proceedings, Scott must come forward with competent, admissible evidence to establish that the supervisor "(1) had notice of a pattern of unconstitutional acts committed by subordinates; (2) was deliberately indifferent to or tacitly authorized those acts; and (3) failed to take sufficient remedial action; (4) proximately causing injury to [him]." Brewington v. Keener, 902 F.3d 796, 803 (8th Cir. 2018) (citation modified). Allegations of generalized notice are insufficient; to give rise to supervisory liability "other misconduct must be very similar to the conduct giving rise to liability." Krigbaum, 808 F.3d at 340 (citation omitted).

"When the issue is qualified immunity from individual liability for failure to train or supervise, deliberate indifference is a subjective standard that entails a level of culpability equal to the criminal law of recklessness." Id. at 341 (citation modified). Scott must demonstrate that each individual supervisor personally knew of the constitutional risk posed by his or her inadequate training or supervision. Id. Eighth Circuit precedent makes it clear that a "warden's general supervisory authority over prison operations does not make him liable under § 1983." Jackson v. Nixon, 747 F.3d 537, 545 (8th Cir. 2014) (citations omitted).

**B.    Eighth Amendment Deliberate Indifference to a Serious Medical Need**

Scott alleges an Eighth Amendment deliberate indifference to serious medical needs claim against Dr. Carpenter, Sullivan, Swygert, Gengler, Tinker, Charge Nurse Stephanie Meinders, Unknown Health Services Leadership, Unknown Officers and West Hall Unit Staff, and Wasko in their individual capacities for money damages. Doc. 25 at 37. Scott has not identified and served any Unknown Health Services Leadership or Unknown Officers and West Hall Unit Staff, and his

17

time for doing so has expired.  See Doc. 92 ¶ 2.  Under Federal Rule of Civil Procedure 21, "[o]n motion or on its own, the court may at any time, on just terms, add or drop a party."  Fed. R. Civ. P. 21.  "District courts in the Eighth Circuit routinely dismiss unknown defendants if the plaintiff has not identified them at the close of discovery."  Chambers v. De La Cruz, No. 4:19-CV-3047, 2022 WL 18586947, at *8 (D. Neb. Dec. 15, 2022).  Thus, Scott's Eighth Amendment deliberate indifference to serious medical needs claim against Unknown Health Services Leadership and Unknown Officers and West Hall Unit Staff in their individual and official capacities are dismissed without prejudice.

"[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' . . . proscribed by the Eighth Amendment."  Estelle v. Gamble, 429 U.S. 97, 104 (1976) (quoting Gregg v. Georgia, 428 U.S. 153, 173 (1976)).  "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed."  Id. at 104–05 (footnotes omitted).  "This conclusion does not mean, however, that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment."  Id. at 105.  "[A] prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  Id. at 106.

The deliberate indifference standard includes both an objective and subjective component.  Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997) (citing Coleman v. Rahija, 114 F.3d 778, 784 (8th Cir. 1997)).  The plaintiff "must demonstrate (1) that [he] suffered objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs."  Id. (citing Coleman, 114 F.3d at 784).  Because deliberate indifference is a subjective

inquiry, a district court must "assess each defendant's 'knowledge at the time in question, not by hindsight's perfect vision.'" Cannon, 112 F.4th at 587 (quoting Schaub v. VonWald, 638 F.3d 905, 915 (8th Cir. 2011)).

Scott's Eighth Amendment deliberate indifference to serious medical needs claims arise out of the withholding of his prescribed hypertension medications from October 26 to October 29, 2022, when he was in the SHU. The Court begins its analysis by considering whether each named Defendant was personally involved in the withholding of his medications and, if so, then considering each Defendant's action, in light of the information the Defendant possessed, to determine whether there is sufficient evidence for a jury to find that Defendant was deliberately indifferent. See Letterman v. Does, 789 F.3d 856, 863–65 (8th Cir. 2015) (evaluating each defendant's actions individually to determine whether the district court had properly granted a motion for summary judgment on the basis of qualified immunity).

Scott has demonstrated that there is at least a genuine issue of material fact whether Gengler and Swygert were personally involved in the denial of his prescribed hypertension medication while he in the SHU from October 26 to October 29, 2022. Doc. 10 at 2, 3; Doc. 165-1; Doc. 170 ¶ 19. It is clearly established that "[w]hen an official denies a person treatment that has been ordered or medication that has been prescribed, constitutional liability may follow." Dadd[13] v. Anoka Cnty., 827 F.3d 749, 757 (8th Cir. 2016); Letterman, 789 F.3d at 862 (recognizing that a defendant "manifests deliberate indifference by intentionally denying or delaying access to

---

[13] Dadd was a pretrial detainee when he alleged he was denied medical treatment. Dadd, 827 F.3d at 753–54. The Eighth Circuit applies the Eighth Amendment deliberate indifference standard when considering a pretrial detainee's claims for denial of medical treatment under the Due Process Clause of the Fourteenth Amendment. See, e.g., Davis v. Hall, 992 F.2d 151, 152 (8th Cir. 1993) (per curiam); see also Dadd, 827 F.3d at 754 (stating that Dadd alleges that defendants "violated his Fourteenth Amendment right to substantive due process through their deliberated indifference towards his serious medical needs").

medical care, or intentionally interfering with treatment or medication that has been prescribed." (internal quotation marks omitted)); Phillips v. Jasper Cnty. Jail, 437 F.3d 791, 796 (8th Cir. 2006) ("[T]he knowing failure to administer prescribed medicine can itself constitute deliberate indifference."). Scott has presented evidence that Gengler and Swygert were aware that he had not received his prescribed hypertension medications, reported having experienced symptoms, and requested to be provided the medications.[14] According to Scott, Gengler and Swygert took no action despite this knowledge. When a prison official knows that a prisoner has been prescribed medication, requests the medication and explains why, but the prison official takes no action, that prison official is not entitled to qualified immunity. See Dadd, 827 F.3d at 753–55. A jury could infer from this evidence, some of which Defendants dispute, that Gengler and Swygert recognized a substantial risk of harm to Scott, acted inappropriately in light of this risk, and recognized the impropriety of their response. Thus, Gengler and Swygert's motion for summary judgment on Scott's Eighth Amendment deliberate indifference to serious medical needs claim is denied.

In opposition to Defendants' motion for summary judgment, Scott argues that there are questions of fact whether Scott had been diagnosed with or was being treated for a seizure disorder immediately prior to October 29, 2022. Doc. 169 at 13–16. To argue that there is a factual dispute whether Defendants knew that Scott had a seizure condition prior to October 29, 2022, Scott contends that Scott's hospital records note that he had a history of seizures. Doc. 169 at 13 (citing Doc. 165-29, Ex. E at Bates 130179). Document 165-29 is the October 29, 2022 emergency room note. Although the "HPI" portion of that emergency room note states that "[h]e does have a history of a seizure[,]" when that sentence is read in context it cannot reasonably be interpreted to mean

---

[14] There is also sufficient evidence in the record for a jury to find that "Nurse Lana" was deliberately indifferent, but Scott's claims against this defendant were dismissed pursuant to Rule 4(m). Doc. 154 at 6.

anything other than in the immediate moments before being transported to the emergency room, Scott experienced a seizure. Id. at 3, 5. That same emergency room record also states that "[l]ooking through his meds it looks like he is possibly taking Dilantin for . . . seizuires." Id. at 3 (Bates 13077). But later in the same paragraph, the record also states that "[w]e did contact the correctional facility and it sounds like he has not been on Dilantin although this is on his medication list." Id. Yet, Scott's DOC medical records do not support that Scott had been prescribed Dilantin/phenytoin prior to the October 29, 2022 emergency room visit, Doc. 151-12 ¶¶ 11, 13. The outside provider's emergency room note generated based on what had just occurred does not create an issue of material fact that any Defendant was deliberately indifferent for disregarding any risk discussed in that note, particularly when the DOC records lack any mention of seizures or prescribed Dilantin prior to October 29, 2022.[15] Scott has not established a genuine issue of material fact on whether he had been diagnosed with a seizure condition or was being treated for a seizure condition on October 26 to October 29, 2022. Scott also asserts that he told correctional officers that "he needed his meds that he has epileptic problems." Doc. 169 at 14 (citing Doc. 165-1, Ex. B, Doc. 3); see also SAMF ¶ 68. The supporting declaration Scott cites establishes only that he told Nurse Lana, who is no longer a defendant, that he needed his medications because he has epileptic problems. See Doc. 165-1 (Ex. B, Doc. 3). There is no record evidence that Scott informed any of the remaining named Defendants that he needed his medications because he had epileptic problems.

---

[15] Scott contends that a "jury should be permitted to determine whether the prison indeed did not have access to the same records on Mr. Scott's health that were in the possession of a third-party provider." Doc. 169 at 14 n.1. Notwithstanding that the prison is not and cannot, under the Eleventh Amendment, be a defendant, this argument, at most, could indicate that "the prison" was negligent, but it does not establish deliberate indifference.

Scott's response to Defendants' motion for summary judgment does not argue or cite to any record evidence that Carpenter, Sullivan, Tinker, or Meinders were personally involved in the denial of his hypertension medication from October 26 to October 29, 2022. Docs. 169, 170. Scott does not argue and or cite to any record evidence that Carpenter, Sullivan, Tinker, or Meinders received notice of a pattern of unconstitutional acts committed by Gengler or Swygert and were deliberately indifferent to or authorized those actions. Carpenter, Sullivan, Tinker, and Meinders are entitled to summary judgment on Scott's Eighth Amendment deliberate indifference to serious medical needs claim.

On January 9, 2023, Sullivan responded to Scott's request for administrative remedy related to the denial of Scott's medications between October 26 and October 29, 2022. SAMF ¶ 29. In his response, Sullivan stated that "Health Services has record of you receiving your medication[.]" Id.; see also Doc. 5-1 at 1. Sullivan's response was inaccurate, and on January 30, 2023, Scott received a response from Health Services confirming that Scott had not received his KOP medication and stating that "[o]ur records reflect that we were working with unit staff from 10/26/22 to 10/29/22 to try to get your self meds . . . ; they are not documented as given to you." Doc. 5-1 at 2. Sullivan's mistaken response is not evidence that he may be liable for failure to train or supervise. As matter of law, whether Sullivan is liable for failure to train or supervise regarding the administration of Scott's medications while in the SHU, must be determined based on Sullivan's knowledge and conduct prior to October 29, 2022. There is no record evidence that Sullivan was personally aware prior to October 29, 2022, that any prison official or health service official had failed to provide any medication to Scott while he was in the SHU.

22

## C. Eighth Amendment Conditions-of-Confinement Claim – Larson

Scott alleges an Eighth Amendment deliberate indifference to conditions-of-confinement claim regarding the placement of Larson in Scott's cell against Sullivan, Vanderaa, Mills, and Wasko in their individual capacities for money damages. Doc. 25 at 37.

"[T]he Constitution 'does not mandate comfortable prisons'; it prohibits 'inhumane ones.'" Williams v. Delo, 49 F.3d 442, 445 (8th Cir. 1995) (quoting Farmer v. Brennan, 511 U.S. 825, 832 (1994)). The Supreme Court has clarified that only "extreme deprivations" that deny "the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." Hudson v. McMillian, 503 U.S. 1, 9 (1992) (internal quotation omitted). The Supreme Court has listed as basic human needs "food, clothing, shelter, medical care, and reasonable safety[.]" Helling v. McKinney, 509 U.S. 25, 32 (1993) (citation omitted).

"To prove an unconstitutional failure to protect from harm, [Scott] must show that (1) he was incarcerated under conditions posing a substantial risk of serious harm, and (2) a defendant was deliberately indifferent to the substantial risk of serious harm." Hodges v. Dep't of Corr., 61 F.4th 588, 592 (8th Cir. 2023) (citing Farmer, 511 U.S. at 834). To satisfy the deliberate indifferent subjective prong, "the evidence must show that the officers recognized that a substantial risk of harm existed *and* knew that their conduct was inappropriate in light of that risk." Krout v. Goemmer, 583 F.3d 557, 567 (8th Cir. 2009) (emphasis in original) (citation omitted). As the Eighth Circuit has recently explained,

> Deliberate indifference is more than mere negligence or the ordinary lack of due care for a prisoner's safety. It is more even than gross negligence. Liability requires a showing that the defendants acted with a highly culpable state of mind that resembles criminal-law recklessness and approaches actual intent. The evidence must demonstrate that officers understood that a substantial risk of harm or medical need existed and that they knew their conduct was inappropriate in light of that risk or need.

23

Hamilton v. Earl, 166 F.4th 1143, 1146 (8th Cir. 2026) (internal citations omitted).

When an inmate does not suffer any injury due to an alleged failure to protect, he fails to satisfy the objective component of a failure-to-protect claim. In Schoelch v. Mitchell, 625 F.3d 1041 (8th Cir. 2010), Schoelch, a pretrial detainee,[16] alleged that a jail guard had failed to protect him from another pretrial detainee on two occasions. Id. at 1044–45. On October 27, the first occasion, a pretrial detainee with a reputation for aggressiveness and misbehavior entered Schoelch's cell, stated that he intended to "kill" him, and then grabbed Schoelch and slammed him against the wall. Id. at 1044. Schoelch did not allege that he suffered any injury as a result of the incident. Id. at 1046. The Eighth Circuit held that the incident did not satisfy the objective component of a failure-to-protect claim. Id. at 1046–47. The Eighth Circuit reasoned:

> Because Schoelch presented no evidence that he suffered an objectively serious mental or physical injury from the conditions of his confinement on October 27, or that the conditions on that date (i.e., the failure to protect him from [the other pretrial detainee] on that date) are likely to cause serious injury in the future, he has not satisfied the objective component of his failure-to protect . . . claim.

Id. at 1047 (internal citation omitted). Here, it is undisputed that during the time that Larson and Scott were housed together, there were no altercations, and Scott does not contend that Larson harmed him or attempted to harm him when they were housed in the same cell. Doc. 151 ¶ 41; Doc. 170 ¶ 41. In a supplement to his complaint, Scott states that "[t]he inmate that I had originally got into the altercation with 'Mr. Larson' was placed into my cell as my cell mate, and he is probably the best cell mate that I have had in almost the 13-years of being incarcerated[.]" Doc. 1-1 at 18. Because Scott has not presented any competent, admissible evidence to demonstrate a genuine factual dispute that he suffered an objectively serious mental or physical injury arising out

---

[16] The Eighth Circuit analyzes pretrial detainee failure-to-protect claims under the Eighth Amendment standard. Holden v. Hirner, 663 F.3d 336, 340–41 (8th Cir. 2011).

of his confinement with Larson or that his confinement with Larson is likely to cause serious injury in the future, he has not satisfied the objective component of his failure-to-protect claim.

Even if Scott were able to satisfy the objective component, there is no record evidence that any of the named Defendants were deliberately indifferent to a risk of serious harm. In a declaration, Scott avers that Vanderaa was present during an administrative hearing when Scott discussed his altercation with Larson.[17] Doc. 10 at 4. In the same declaration, Scott avers that Vanderaa and Mills placed Larson in Scott's cell despite protests from Scott and "Officer DeKam[.]" Id. at 4–5. But there is no record evidence regarding the specifics of these "protests," other than Scott's complaint that he was being housed with an inmate with whom he had previously had an altercation. Doc. 165-15 at 5–6. While there is evidence that Vanderaa and Mills were aware that Scott and Larson had a prior alteration, there is no evidence that Vanderaa or Mills, because the previous altercation, had concluded that housing Larson with Scott posed a substantial risk of harm to Scott, especially when Scott himself never reported to Vanderaa or Mills that he had specific reasons to suspect that Larson would harm him again.

Scott has not come forward with any competent, admissible evidence to establish that Sullivan, who was the warden of the SDSP in January 2023, or Wasko, who was the Secretary of Corrections in January 2023, had any personal involvement in the decision to place Larson in Scott's cell or that Scott reported to either of them that Larson posed a substantial risk of serious harm to him.[18] Even if Sullivan or Wasko were aware that Scott did not want to be housed with

---

[17] Scott's declaration does not state that he discussed "his fears of Mr. Larson" during the administrative hearing. SAMF ¶ 12 (citing Doc. 10 at 4, which is attached as Ex. F to Doc. 165).
[18] In his complaint and amended complaint, Scott generally alleges that Sullivan and Wasko were aware of his concerns about being housed with Larson. See supra at 9. A party opposing a motion for summary judgment "may not rest upon mere allegations or denials" in his or her pleading but "must set forth specific facts showing [the existence of] a genuine issue for trial." Gacek, 666 F.3d

Larson because of a prior altercation, there is no competent record evidence Sullivan or Wasko had notice of any pattern of similar conduct by Mills and Vanderaa.

For these reasons, Sullivan, Vanderaa, Mills, and Wasko are entitled to summary judgment on Scott's Eighth Amendment deliberate indifference to conditions-of-confinement claim regarding the placement of Larson in Scott's cell.

### D.       Eighth Amendment Conditions of Confinement Claim - Burton

Scott alleges an Eighth Amendment deliberate indifference to conditions-of-confinement claim regarding the placement of Burton in Scott's cell against Wasko in her individual capacity for money damages. Doc. 25 at 37. In response to Defendants' motion for summary judgment, Scott does not confine his arguments regarding Scott's placement with Burton to what Wasko did or knew. Doc. 169 at 4–9. Instead, Scott argues that "[d]espite knowing both Mr. Scott's concerns and each violent inmate's history of assaults, Defendants placed him in cells with Inmate Larson and Inmate Burton." Id. at 8.[19] There is no record evidence that Wasko had any involvement in the decision to place Burton in Scott's cell, was aware that Burton had been placed in Scott's cell, or that Scott had raised any concerns about being housed with Burton.

---

at 1145–46 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)); see also Mosley, 415 F.3d at 910 (stating that a nonmovant may not merely rely on allegations or denials).

[19] Scott cannot through his response to Defendants' motion for summary judgment, in essence amend his complaint to allege that additional Defendants are liable on any of his claims. Rodgers v. City of Des Moines, 435 F.3d 904, 909–10 (8th Cir. 2006) (holding that the district court did not abuse its discretion or commit any error of law by refusing to consider allegations not pled in the complaint and raised for the first time in opposition to a motion for summary judgment); Statler v. Buffalo-Bodega Complex, Inc., No. CIV 06-5003, 2007 WL 320959, at *4 (D.S.D. Jan. 30, 2007). If Scott wanted to allege that additional defendants, in their individual capacities, are liable for placing Burton in his cell, then he should have filed a motion to amend his complaint and a proposed amended complaint outlining the supporting factual allegations. He did not do so, and this Court considers only the specific claims alleged against the specific Defendants that survived § 1915A screening. See generally Doc. 25.

Scott and Burton were never involved in any verbal or physical altercation. Doc. 151 ¶¶ 47, 79; Doc. 170 ¶¶ 47, 79. Scott did not report any incidents with Burton during the time that they were housed in the same cell. Doc. 151 ¶ 71; Doc. 170 ¶ 71. Thus, Scott has not presented any competent, admissible evidence to demonstrate a genuine factual dispute that he suffered an objectively serious mental or physical injury arising out of his confinement with Burton or that his confinement with Burton is likely to cause serious injury in the future. He thus has not satisfied the objective component of his failure-to-protect claim.

The record evidence establishes only that Scott believed that Burton is unstable and has a history of assaults on prior cell mates and officers. Doc. 22-1 at 6; Doc. 151 ¶ 75; Doc. 170 ¶ 75. In his response to Defendants' motion for summary judgment, Scott does not dispute that he, "without offering any evidence, makes a general complaint that Burton has a history of assaults on prior cell mates and officers." Doc. 170 ¶ 74. But Scott qualifies his response by stating that he "does not have access to Burton's history of assaults as those records are in the possession of Defendants and were not produced." Id. It is not Defendants' burden to produce evidence to support Scott's claims. Scott could have served discovery requests requiring Defendants to produce any records or documents demonstrating that Burton has a history of assaulting other inmates or officers. The record contains no indication that he did so. Scott has not even come forward with any competent, admissible evidence that Burton has a history of violent assaults, but even if he had, "[a]n inmate's history of violence alone is insufficient to impute to prison officials subjective knowledge of the inmate's danger to harm other inmates." Holden v. Hirner, 663 F.3d 336, 341 (8th Cir. 2011). For these reasons, Wasko's motion for summary judgment on Scott's Eighth Amendment deliberate indifference to conditions-of-confinement claim arising out of his placement with Burton is granted.

### E.      Eighth Amendment Conditions-of-Confinement Claim – Pepper Spray

After screening, Wasko is the only remaining Defendant on Scott's Eighth Amendment deliberate indifference to conditions-of-confinement claim arising out of his placement in a cell containing pepper spray residue. Doc. 25 at 19, 37.

Scott contends that "he was placed in a cell on Apr. 4. 2023, that was doused in several cannisters' worth of pepper spray without the means to clean it." Doc. 169 at 10 (citing Doc. 165-14 (Ex. M, Doc. 22 at 3)). Paragraph 13 of Scott's affidavit (Ex. M) avers that he was housed in a cell that "was extremely pepper sprayed with several cans of pepper spray, by officers to the previous inmates, that were housed in that cell[.]" Doc. 22 ¶ 13 (capitalization in original omitted). The only remaining Defendant on this claim is Wasko. There is no evidence in the record whatsoever that Wasko was aware of Scott's claim that he had been housed in a cell with pepper spray residue. Scott alleges that pepper spray is a "stressor" for his "seizures which include migraine headaches, blurred vision, and stomach pains[,]" see Doc. 22 ¶ 14 (capitalization in original omitted), but there is no record evidence that Wasko was aware that pepper spray is a stressor for Scott's seizures. According to Scott's opposition to Defendants' motion for summary judgment, "[t]he fact that he was initially allowed to clean indicates that the prison knew cleaning was required to avoid harm, and yet officials still prevented him from finishing cleaning." Doc. 169 at 11. But Scott cannot overcome Wasko's motion for summary judgment based on what the "prison" knew or what "officials" allegedly did. He must come forward with evidence to establish that Wasko was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and that Wasko did, in fact, draw that inference. Kulkay v. Roy, 847 F.3d 637, 643 (8th Cir. 2017). Scott does not point to any such record evidence. See generally Docs. 169, 170.

28

Here, the record contains no evidence that Wasko was ever made aware that Scott been placed in a cell with pepper spray residue, but even if Wasko were aware of it this incident, it is well established that a single incident cannot serve as notice of a pattern of misconduct required for a supervisor to be held under § 1983 for failure supervise or failure to train. Brewington, 902 F.3d at 803. Wasko's motion for summary judgment on Scott's Eighth Amendment deliberate indifference to conditions-of-confinement claim arising out of his placement in a cell containing pepper spray residue is granted.

Scott also seeks injunctive relief against certain Defendants in their official capacities on his Eighth Amendment conditions-of-confinement claims. Doc. 25 at 38. Because this Court has granted summary judgment in favor of the named Defendants in their individual capacities on Scott's Eighth Amendment conditions-of-confinement claims, Scott's official capacity claims for injunctive relief are also dismissed. Heartland Acad. Cmty. Church v. Waddle, 317 F. Supp. 2d 984, 1107 (E.D. Mo. 2004) (stating that when a plaintiff seeks injunctive relief for an alleged constitutional violation, the court must "first consider whether plaintiff has established the fact of a violation" (internal quotation marks omitted)); aff'd, 427 F.3d 525 (8th Cir. 2005).

### F.    First Amendment Retaliation

#### 1.    Elements of First Amendment Retaliation Claim

Scott asserts a First Amendment retaliation claim against Sullivan, Vanderaa, Mills, Swygert, and Wasko in their individual capacities for money damages. To state a First Amendment retaliation claim, Scott must first show that he engaged in a protected First Amendment activity. Aldridge v. City of St. Louis, 75 F.4th 895, 898 (8th Cir. 2023) (citing Molina v. City of St. Louis, 59 F.4th 334, 338 (8th Cir. 2023)). Scott must then point to "an adverse action that would chill a person of ordinary firmness from continuing in the protected

activity." Id. at 899 (citation modified).  Lastly, Scott must show that the adverse action was "a 'but-for cause' of the injury [suffered.]" Beard v. Falkenrath, 97 F.4th 1109, 1119 (8th Cir. 2024) (alteration in original) (quoting Nieves v. Bartlett, 587 U.S. 391, 399 (2019)). "It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must *cause* the injury." Nieves, 587 U.S. at 398 (emphasis in original).

Regarding this last prong, "prisoners face a substantial burden in showing that a prison official's actions would not have occurred 'but for' a retaliatory motive." Pedraza v. Dill, No. 4:22-CV-01119-BSM-BBM, 2025 WL 1983178, at *4 (E.D. Ark. June 17, 2025) (citing Sisneros v. Nix, 95 F.3d 749, 752 (8th Cir. 1996)).  "[M]ere allegations of retaliatory motive are insufficient[,]" De Rossitte v. Correct Care Sol., LLC, 22 F.4th 796, 804 (8th Cir. 2022), and a plaintiff must do more than make conclusory statements about what he believed the defendants' motivations to be, Hageman v. Morrison Cnty., No. 19-CV-3019 (JRT/HB), 2022 WL 1110164, at *14 (D. Minn. Feb. 1, 2022), report and recommendation adopted by 2022 WL 897721 (D. Minn. Mar. 28, 2022).  See also Williamson v. Budnik, No. 4:23-CV-545-DPM-BBM, 2024 WL 1663308, at *5–6 (E.D. Ark. Mar. 18, 2024), report and recommendation adopted by 2024 WL 1658917 (E.D. Ark. Apr. 17, 2024) (holding that the plaintiff failed to state a retaliation claim when there was nothing in the plaintiff's allegations to "indicate a retaliatory motive beyond pure speculation"); Glaum v. Braun, No. 1:24-CV-146, 2025 WL 1067441, at *8 n.10 (D.N.D. Apr. 9, 2025) (a plaintiff's allegation that "prison 'management is violating [his] rights and retaliating against him for bringing suit[],'" amounts to a "conclusory allegation that is insufficient to plausibly allege First Amendment retaliation" (first alteration in original)).  A plaintiff's retaliation claims fail when the plaintiff "cites no evidence, either direct or indirect, linking any adverse action to [the protected activity]." De Rossitte, 22 F.4th at 804; see also East v. Wasko, No. 4:22-CV-

30

04126-RAL, 2025 WL 969219, at *7 (D.S.D. Mar. 31, 2025), aff'd, No. 25-1894, 2025 WL 3122873 (8th Cir. Nov. 7, 2025) (per curiam) (finding that defendants were entitled to summary judgment when the record demonstrated that the alleged adverse action "involved no retaliatory animus and was not a 'but for' cause" of the plaintiff's injury).

Here, the parties do not dispute that filing grievances and a lawsuit are protected First Amendment conduct. See Lewis v. Jacks, 486 F.3d 1025, 1029 (8th Cir. 2007) (recognizing that filing a prison grievance is protected First Amendment conduct); Spencer v. Jackson Cnty., 738 F.3d 907, 911 (8th Cir. 2013) (recognizing that the right to file a legal action is protected First Amendment conduct). Adverse actions which show retaliation can include denial of privileges, denial of employment, or worsening of working conditions. Spencer, 738 F.3d at 911. Defendants consider prison jobs to be a privilege, and no prisoner has right or legitimate expectation to work in any particular job assignment. Doc. 151 ¶ 62. Eighth Circuit precedent is clear that "[t]he retaliatory conduct itself need not be a constitutional violation; the violation is acting in retaliation for the exercise of a constitutionally protected right." Spencer, 738 F.3d at 911 (citation modified); see also Dixon v. Brown, 38 F.3d 379, 379 (8th Cir. 1994) (recognizing that while the termination of any privilege, including prison employment, may not itself be actionable under § 1983, the termination becomes actionable if done in retaliation for engaging in First Amendment protected activity).

The record demonstrates that Scott himself was not actually deterred by any of the alleged retaliatory acts. He filed a second lawsuit on July 26, 2023,[20] and filings in this case and in Scott's subsequent lawsuit demonstrate that he has continued to file grievances despite the alleged retaliatory conduct.

---

[20] Scott v. Haynes, No. 4:23-CV-04115-RAL, Doc. 1 (D.S.D. July 26, 2023).

31

But to prevail on his First Amendment retaliation claim, Scott must demonstrate that the named Defendants took adverse action that would chill a person of ordinary firmness from continuing in the activity. Aldridge, 75 F.4th at 899. "The question is not whether the plaintiff [himself] was deterred, though how the plaintiff acted might be evidence of what a reasonable person would have done." Garcia v. City of Trenton, 348 F.3d 726, 729 (8th Cir. 2003). The parties do not address whether the alleged adverse actions would chill a prisoner of ordinary firmness from filing grievances or lawsuits. See generally Docs. 150, 169, 176. On summary judgment, this Court must take the facts in the light most favorable to non-movant Scott and thus cannot grant summary judgment on this point.

### 2.   Causation Element

Scott alleges that he was retaliated against for filing grievances and a lawsuit by placing dangerous inmates in his cell, by preventing him from obtaining employment in late 2022 and early 2023, by firing him from his kitchen job, and by placing him in a cell with pepper spray contamination. Doc. 169 at 19–28.

### a.   Placement of "dangerous" inmates in his cell

For the reasons this Court has previously discussed, see supra at 25–27, this claim is more appropriately described as a claim for housing Scott with inmates Scott *believes* were dangerous. Scott believes that Larson and Burton were housed with him in retaliation for filing grievances and complaints about the prison. SAMF ¶ 4. In support of this, Scott cites an informal resolution request dated January 7, 2023, asserting that Vanderaa had denied him the opportunity for employment and seeking "immediate job placement at the school, job placement at the PI [Pheasantland Industries] shops if called for, no more retaliation, no more double standards or favortism [sic] by staff to inmates, no more breaking state or federal law and policies." Doc. 165-

12 at 17–18 (Doc. 1-1 at 17–18) (capitalization in original omitted). This informal resolution request makes only a passing reference to Larson, asserting that "the Powers that 'Be' tried to put [him] in harms ways[.]" Id. at 18. Scott does not allege that his placement with Larson was retaliatory, and he provides no facts showing that it was.

Scott also cites to a request for administrative remedy dated March 28, 2023, asserting that he had for the second time been placed with an inmate who posed a serious risk of harm to him. Doc. 165-12 at 6 (Ex. K at 6). Although Scott requests as a remedy "to be free of any and all retaliation from Officers, Unit Staff and those who are employed or contracted by the Department of Corrections of South Dakota[,]" see id. at 7, Scott's conclusory allegations of retaliation are insufficient as a matter of law to establish the requisite "but for" causation. There is no record evidence, either direct or indirect, linking the decision to house him with Larson or Burton to any grievance or other protected activity.[21] Defendants are entitled to summary judgment on Scott's retaliation claim arising out of his placement with allegedly dangerous inmates.

### b. Preventing Scott from Obtaining Employment in Late 2022 and Early 2023

Whether Vanderaa and Mills denied Scott employment opportunities in late 2022 and early 2023 because Scott had filed a grievance regarding the denial of his Lisinopril and HCTZ is genuinely disputed. Scott contends that Vanderaa informed him that he would be ineligible for employment for six months when he returned to his unit from the SHU in November 2022, notwithstanding a DOC policy that allows revocation of privileges for a maximum of 60 days for violations. SAMF ¶¶ 15–16. Scott contends that other inmates returning from the SHU regularly receive job assignments within weeks. Id. ¶ 20.

---

[21] Scott was housed with Larson in January 2023, Doc. 151 ¶ 30; Doc. 170 ¶ 30, which is well before Scott commenced this lawsuit.

Scott contends that the hiring supervisor at the prison education building emailed Vanderaa in early January 2023 and requested to hire Scott, but Vanderaa denied the request. Id. ¶ 21. Vanderaa, according to Scott, told him that he needed to have six months pass before he would be put on a job wait list. Doc. 165-16 at 17. Vanderaa then told Scott that he "should not be fighting people and that in his world that doesnt [sic] happen." Id.

On January 29, 2023, Scott sent a kite to an officer who is not named as a defendant requesting assistance in obtaining employment. SAMF ¶ 32. That officer responded that he was fine with Scott going to work, "but [he] didn't sanction [Scott]. [He] can't override Vanderaa." Doc. 165-16 at 3–4. Finally, Scott contends that Mills initially informed Scott that if he wanted a job, Scott should kite him, but when Scott did so, Mills responded that he did not have to give Scott a job. Doc. 5-1 at 7. If the facts genuinely in dispute are viewed in the light most favorable to Scott, a jury could find that shortly after Scott filed a grievance regarding the denial of his medications, Vanderaa and Mills "enhanced" his sanctions to deny him work opportunities. SAMF ¶¶ 24, 25. Because there are genuine issue of material facts regarding the reasons that Vanderaa and Mills denied Scott employment opportunities in late 2022 and early 2023, Vanderaa and Mills's motion for summary judgment on Scott's retaliation claim arising out of the denial of employment opportunities in late 2022 and early 2023 is denied.

### c.    Terminating Scott from His Kitchen Job on February 16, 2023

Scott contends that he "has also proffered sufficient evidence to support a jury's finding that Defendants fired Mr. Scott on February 16, 2023, because of his grievances and civil suit." Doc. 169 at 26. Scott was fired from his kitchen job on February 16, 2023, but it is undisputed that Linda, the kitchen supervisor, not any of the named defendants, fired him. Doc. 9 at 2 ("That same day on 2/16/2023, I was terminated by Ms. Linda, because she said that I was the one being

34

racial and that I needed to focus on my civil case."). After having Scott work all day on February 16, 2023, Linda, according to Scott, called Mills and "had [him] terminated." Doc. 18-1 at 29. There is no record evidence that Mills was present when Scott reported Swygert's allegedly racist behavior earlier in the day or that Mills was even aware that Scott had complained about Swygert's conduct earlier in the day. Scott recalls that Mills told him that he lost his job because "Ms. Linda did not need to hear [his] complaints[,]" on March 10, 2023, almost a month after he had been terminated. Doc. 165-13 at 15 (Ex. L, Doc. 19 at 15).

For purposes of considering Linda's role, this Court takes judicial notice that at all relevant times, Aramark Food Service was the vendor with whom the South Dakota Department of Corrections had contracted to provide food services at its facilities, and Linda, the kitchen supervisor, was an employee of Aramark. See Fed. R. Evid 201(b), (c), (d). In fact, in a subsequent case Scott commenced, Scott v. Haynes, 4:23-CV-04115-RAL (D.S.D.), Scott named Aramark, Tanya of Aramark, and Linda of Aramark as defendants, id. Doc. 20 ¶¶ 23, 24, 25, and alleged that Linda terminated him in retaliation for filing complaints, grievances, and lawsuits, id. ¶ 51. Scott's claims against Aramark, Tanya, and Linda were dismissed under Rule 4(m). Id. Doc. 77.

Whether Scott was terminated for complaining about Swygert's conduct or for poor work performance is disputed, but there is no dispute that Linda, who is not a named defendant, is the one who terminated Scott on February 16, 2023. Further, there is no record evidence that Sullivan, Vanderaa, Mills, Swygert, and Wasko directed Linda, or even played any role, in her decision to fire Scott on February 16, 2023. The named Defendants are entitled to summary judgment on Scott's retaliation claim arising out of his termination from his kitchen job on February 16, 2023.

### d.    Placing Scott in a Contaminated Cell

Scott contends that he was placed in a cell contaminated with pepper spray residue in retaliation for filing grievances and this lawsuit. Doc. 169 at 27–28. Scott raises this claim for the first time in opposition to Defendants' motion for summary judgment. See Doc. 1; Doc. 15-1; Doc. 25 at 17–20, 27–28. Although he previously alleged an Eighth Amendment conditions-of-confinement claim arising of this incident, Scott did not contend this incident was retaliatory until he responded to Defendants' motion for summary judgment. Scott cannot enlarge the basis for his claims based on arguments made in response to a motion for summary judgment. Statler v. Buffalo-Bodega Complex, Inc., No. CIV 06-5003, 2007 WL 320959, at *4 (D.S.D. Jan. 30, 2007).

Regardless, none of the record evidence Scott cites in support of this claim, Doc. 165-22 (Ex. U), even mentions Scott's placement in a cell he believed to be contaminated with pepper spray residue. There is no record evidence that any of the named Defendants were even aware the cell had allegedly been contaminated with pepper spray at the time the decision was made to place Scott there. Scott's conclusory allegations of a retaliatory motive, raised for the first time in response to Defendants' motion for summary judgment, are insufficient to create a genuine dispute of material fact. Defendants are entitled to summary judgment on Scott's First Amendment retaliation claim arising of his placement in a contaminated cell.

### 3.    Official Capacity Claims for Injunctive Relief

Defendants' summary judgment submissions do not address Scott's official capacity claims for injunctive relief on his First Amendment retaliation claims. See generally Docs. 150, 176. Because this Court denies Vanderaa and Mill's motion for summary judgment on Scott's First Amendment retaliation individual capacity claim, Scott's official capacity claims against Vanderaa, Mills, Roemmich, and Lamb for injunctive relief on his First Amendment retaliation

36

claim survive the motion for summary judgment. Scott's official capacity claims for injunctive relief on his First Amendment retaliation claim against the Health Services Defendants (Haynes and Tinker) are dismissed.

### G.    Equal Protection

Scott asserts a Fourteenth Amendment equal protection claim against Swygert and Wasko in their individual capacities for money damages. Doc. 25 at 38. The Equal Protection Clause of the Fourteenth Amendment requires the government to "'treat similarly situated people alike,' a protection that applies to prison inmates." Murphy v. Mo. Dep't of Corr., 372 F.3d 979, 984 (8th Cir. 2004) (quoting Rouse v. Benton, 193 F.3d 936, 942 (8th Cir. 1999)). To show an equal protection violation, a plaintiff "must show that he is treated differently than a similarly situated class of inmates, that the different treatment burdens one of his fundamental rights, and that the different treatment bears no rational relation to any legitimate penal interest." Id. (citing Weiler v. Purkett, 137 F.3d 1047, 1051 (8th Cir. 1998) (en banc)). It is also an equal protection violation if "the different treatment is based upon . . . a suspect classification[.]" Patel v. U.S. Bureau of Prisons, 515 F.3d 807, 815 (8th Cir. 2008) (citations omitted). "Suspect classifications include those such as race, alienage, gender, or national origin." Knapp v. Hanson, 183 F.3d 786, 789 (8th Cir. 1999).

Scott claims that Swygert "taunt[ed]" and "harass[ed]" him and "used racial slurs" while he was working in the kitchen on February 16, 2023. See Doc. 15-1 at 6. Even taking Scott's allegations as true, it is an exaggeration to characterize what Swygert allegedly said or did as a racial slur.[22] See Doc. 9 at 1–2. But even if Swygert's choice of words was somehow racially

---

[22] Swygert allegedly approached Scott and sarcastically said "why am I so mad," to which Scott responded, "I am black and that is my natural look." Swygert replied "you said it not me." Doc. 9 at 1–2.

derogatory or offensive, that alone does not violate the Fourteenth Amendment. Lewis, 486 F.3d at 1028 ("[E]ven the use of reprehensible racially derogatory language, is not by itself unconstitutional race discrimination unless it is pervasive or severe enough to amount to racial harassment." (citation modified)). Scott's handwritten description under penalty of perjury of Swygert's actions on February 16, 2023, see Doc. 9 at 1–2, does not, as a matter of law, establish actions sufficiently pervasive or severe enough to amount to racial harassment.

Scott also contends that he was terminated from his kitchen job "for racially motivated reasons—in particular, being a Black man who objected to racism." Doc. 169 at 30. As previously explained, there is a genuine issue of material fact whether Linda terminated Scott from his kitchen job because he complained about Swygert's conduct on February 16, 2023. See supra 34–35. But Linda is not a Defendant in this action. In his response, Scott acknowledges this, but contends that "her comments are nonetheless relevant to [his] allegation that she fired [him] at Defendant Swaggert's [sic] direction." Doc. 169 at 30 n.5. First, Scott does not allege in his complaint or amended complaint that Swygert directed Linda to fire him. See generally Docs. 1, 15-1, 27. But even if he had, Scott has not identified any competent, admissible evidence that Swygert directed Linda to fire him. Sywgert's motion for summary judgment on Scott's equal protection claim is granted.

Because Scott has not demonstrated that Swygert violated his Fourteenth Amendment right to equal protection, Wasko, as a matter of law, cannot be liable for failing to train or supervise Swygert. Davis v. Buchanan Cnty., 11 F.4th 604, 624 (8th Cir. 2021). But for the sake of completeness, this Court will address Scott's assertion that "all of these actions happened against the backdrop of SDSP's history of racially disparate treatment." Doc. 169 at 30–31 (citing Doc.

165-3 (Ex. CC) and Doc. 165-2 (Ex. BB)).[23]   First, Scott does not cite to any admissible evidence

to support this assertion.  "[O]nly evidence that would be admissible at trial may be relied upon to

counter a motion for summary judgment."  Sokol & Assocs., Inc. v. Techsonic Indus., Inc., 495

F.3d 605, 622 n.4 (8th Cir. 2007) (citation omitted).  Exhibit BB appears to be an online news

article reporting about a lawsuit that a former Native American correctional officer at Mike Durfee

State Prison had filed alleging race discrimination.  Doc. 165-2.[24]   Exhibit BB is inadmissible

hearsay.  Nooner v. Norris, 594 F.3d 592, 603 (8th Cir. 2010) (holding that "[n]ewpaper articles

are 'rank hearsay'" that cannot be relied upon to oppose summary judgment).

Exhibit CC is a letter from the Public Information Officer for the South Dakota Department

of Corrections responding to a request for information regarding the racial demographics of

offenders in restrictive housing at the SDSP.  Doc. 165-3.  Scott does not provide sufficient

foundation to show that Exhibit CC falls within a hearsay exception.  Exhibit CC (Doc. 165-3) is

not an admission of a party opponent; the Department of Corrections is not a defendant.  But even

if this Court were to consider these two exhibits, which are inadmissible hearsay, they are

insufficient to find that Wasko has "failed to correct unconstitutional policies, practices, or

conditions."  Doc. 169 at 31.  Allegations of generalized notice are insufficient to support a failure

---

[23] Scott also contends that he "experienced other racially charged incidents while in DOC custody."
SAMF ¶ 80.  To support this statement, Scott cites to his amended complaint filed in Scott v.
Haynes, 4:23-CV-04115-RAL, Doc. 20 (D.S.D. Jan. 9, 2024).  Allegations in Scott's amended
complaint filed after the incident giving rise to his equal protection claim are not sufficient to
provide notice of a pattern of unconstitutional conduct.
[24] The Court has reviewed the amended complaint that was filed in that action, Tronvold v. Kellie
Wasko, 4:22-CV-04182-KES, Doc. 25 (D.S.D. Sept. 1, 2023).  According to the amended
complaint, the correctional officer was allegedly unlawfully terminated three days before Wasko
was appointed as the Secretary of Corrections.  Id. at 1.  Tronvold, the plaintiff, is an enrolled tribal
member of the Yankton Sioux Tribe.  Id.  The parties jointly moved to dismiss the action with
prejudice before the court or a jury considered Tronvold's claims.  The Court declines to consider
Exhibit BB, related to an employment situation at MDSP, as evidence of the "SDSP's history
racially disparate treatment."

to supervise claim; notice requires a pattern of conduct very similar to the conduct giving rise to liability. Jennings v. Nash, No. 6:18-CV-03261-NKL, 2020 WL 234678, at *23 (W.D. Mo. Jan. 15, 2020). The record is devoid of any conduct by Swygert very similar to the circumstances Scott describes surrounding his employment termination. Wasko is entitled to summary judgment on Scott's equal protection claim.

## V.      Conclusion

Accordingly, it is

ORDERED that Defendants' motion for summary judgment, Doc. 149, is granted in part and denied in part:

- Gengler and Sywgert's motion for summary judgment on Scott's Eighth Amendment deliberate indifference to serious medical needs claim is denied.

- Carpenter, Sullivan, Tinker, and Meinders are entitled to summary judgement on Scott's Eighth Amendment deliberate indifference to serious medical needs claim.

- Sullivan, Vanderaa, Mills, and Wasko are entitled to summary judgment on Scott's Eighth Amendment deliberate indifference to conditions-of-confinement claim regarding the placement of Larson in Scott's cell.

- Wasko's motion for summary judgment on Scott's Eighth Amendment deliberate indifference to conditions-of-confinement claim arising out of his placement with Burton and in a cell containing pepper spray residue is granted.

- All remaining Defendants are entitled to summary judgment in their official capacities on Scott's Eighth Amendment conditions-of-confinement claims.

- Vanderaa and Mill's motion for summary judgment on Scott's individual capacity retaliation claim arising out of the denial of employment opportunities in late 2022

40

and early 2023 is denied. Vanderaa and Mills are entitled to summary judgment on the remainder of Scott's individual capacity retaliation claims.

- Sullivan, Swygert, and Wasko are entitled to summary judgment on all of Scott's individual capacity retaliation claims.

- Vanderaa, Mills, Roemmich, and Lamb, in their official capacities, are not entitled to summary judgment on Scott's First Amendment retaliation claim for injunctive relief. Scott's official capacity claims for injunctive relief on his First Amendment retaliation claim against the Health Services Defendants (Haynes and Tinker) are dismissed.

- Swygert and Wasko are entitled to summary judgment on Scott's equal protection claim. It is further

ORDERED that Scott's Eighth Amendment deliberate indifference to serious medical needs claim against unknown health services leadership and unknown officers and West Hall Unit Staff in their individual and official capacities is dismissed without prejudice.

DATED this 31st day of March, 2026.

BY THE COURT:

_____
ROBERTO A. LANGE
CHIEF JUDGE

41